**Cohen, Placitella & Roth, P.C.**
Christopher M. Placitella, Esq. (ID 27781981)
127 Maple Avenue
Red Bank, New Jersey 07701
(732) 747-9003
cplacitella@cprlaw.com

(Additional Counsel are identified below)

| | |
|---|---|
| **DANIEL EDLEY and ROGER EDLEY** individually, as personal representatives of the Estate of Laszlo "Louis" Edley, deceased on behalf of said Estate, and as representative of others similarly situated,<br><br>　Plaintiffs,<br><br>　　　　　　vs.<br><br>**JOHNSON & JOHNSON,**<br><br>**John/Jane Doe Attorneys 1-1000** are the fictitious names of lawyers and law firms, legal professional corporations, legal professional partnerships, or other professional business entities or organizations, or their agents, employees, or servants, acting within the course and scope of their employment, or other individuals whose identities are not presently known, and who may have perpetrated, and/or are responsible for, or are the alter egos of, or are otherwise responsible for the conduct or liability of those who perpetrated, aided and abetted, or acted in concert with, in furtherance of, or in conjunction with the others in the conduct, activities, acts, and omissions set forth herein, and<br><br>**John/Jane Doe J&J Corporate Members 1-1000,** are the fictitious names of individuals who are fictitiously named defendants that are or were Directors, officers and/or employees of Johnson & Johnson whose identities are not presently known, and who may have perpetrated, aided and abetted, or acted in concert with, in furtherance of, or in conjunction with, the others in the conduct, activities, acts, and omissions set forth herein,<br><br>　Defendants. | SUPERIOR COURT OF NEW JERSEY<br><br>LAW DIVISION<br><br>MIDDLESEX COUNTY<br><br><br>Civil Action No.<br><br><br>CLASS ACTION COMPLAINT AND JURY DEMAND |

**"All of the talc mined by Windsor Minerals Inc., whether ultimately sold to industrial users or used in Johnson's Baby Powder, is sampled and tested for the presence of asbestos and no evidence of the presence of asbestos in any Windsor Minerals product has ever been revealed."**

—**_Exhibit 1_**, _August 27, 1986, Letter from John Beidler, Esq., Office of Johnson & Johnson's General Counsel, to Ronald Grayzel, Esq., attorney for Louis Edley, which was repeated verbatim in an affidavit offered in support of the dismissal of the Edley case, dated July 13, 1987, signed by Roger N. Miller, President of Windsor Minerals, Inc. (See **_Exhibit 34_**)._

**"Q.    This is the President of Windsor Mineral [Roger N. Miller] in a lawsuit saying, no evidence of the presence of asbestos in Windsor Minerals' product.**
**And he included -- I asked you, he included everything they'd ever sold, cosmetic and industrial, has ever revealed or been revealed by this testing.**
**Here's the question. Was that true or was that false?**
**A.     On the face of it, it does not appear to be true.**
                                                          **\*\*\*\***
**Q.    And he was under oath, wasn't he?**
**A.     I believe so, yes.**
**Q.    And that is -- you understand that is perjury, do you not?**
**A.     I do."**

—**_Exhibit 2_**, _Testimony of Dr. John Hopkins, Ph.D., (Vol. 1 of 2), Johnson & Johnson Corporate Representative, 7/23/2019 _Barden_ Trial Transcript, 192:24-193:7; 194:24-195:3._

**"What could be more important to a claim that talc caused asbestos disease than proof that the talc contained asbestos?"**

—_Williams v. BASF Catalysts LLC_, 765 F.3d 306, 322 (3d Cir. 2014) (Fuentes, J.).

## COMPLAINT

Plaintiffs, Daniel Edley and Roger Edley, bring this suit in their individual capacity, as personal representatives of the Estate of Laszlo ("Louis") Edley, deceased, individually and on behalf of all other individuals similarly situated, for their claims and causes of action against Johnson & Johnson (**"J&J"**) and the fictitious defendants referenced herein, based upon personal knowledge as to Plaintiffs' own family members' respective actions and, as to all other

matters, upon information and belief based upon the investigation of counsel,[1] and state and

allege against Defendant, and in the alternative the following:

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 4

II.   PARTIES ........................................................................................................ 11

   A.   Plaintiffs ..................................................................................................... 11

   B.   Defendant Johnson & Johnson ................................................................... 12

   C.   John/Jane Doe Defendants .......................................................................... 15

III. VENUE AND JURISDICTION .......................................................................... 16

IV.   FACTS COMMON TO CLASS CERTIFICATION AND ALL COUNTS ...................... 16

   A.   By the early 1970s, J&J knew of the presence of asbestos in Windsor Minerals talc ..... 16

   B.   J&J created and utilized testing protocols designed to prevent the detection of asbestos present in samples and required certain words to be employed in reporting results to create the false impression that there was no asbestos in J&J's talc. ........................................................ 22

   C.   J&J made material misrepresentations to courts and litigants for more than 40 years. ... 27

      1.   *Edley v. Windsor Minerals Inc., et al.*, No. MID-L-075913-86 (N.J. Law Div.). ........ 27

      2.   Thousands of fraudulent dismissals followed in the 1980s and 1990s. ...................... 31

      3.   *Durham v. Metropolitan Life Ins. Co.*, No. 05C-07-136 ASB (Del. Sup. Ct. New Castle Cnty.) ..................................................................................................................... 32

      4.   *Lopez v. J&J*, (2007) ........................................................................................... 33

   D.   The same J&J misrepresentations were made to every plaintiff. ...................... 34

   E.   J&J's destruction and concealment of relevant evidence. ............................... 36

      1.   J&J's failure to preserve talc samples and testing documentation and output. ........... 37

      2.   J&J's failure to preserve litigation case materials and records. ................................ 40

---

[1] The investigation of Plaintiffs' counsel, Cohen, Placitella & Roth, P.C. (**"CPR"**), includes the discovery taken in the litigation of talc cases by members of CPR and by other claimants' counsel, in which counsel were fortunate to have begun unearthing the misconduct of Johnson & Johnson in previous waves of asbestos litigation. This includes the investigation and discovery conducted in asbestos civil actions conducted before the Superior Court of New Jersey, Middlesex Vicinage's Asbestos Program. Such lawsuits addressed the existence of asbestos in talc sold for cosmetic/personal application as well as that sold and distributed for industrial and manufacturing use (hereinafter as **"Industrial Talc"** or **"Industrial Talc Products"**). This matter, as explained herein, only involves **"Underlying Lawsuits"** that asserted claims based upon exposure to Industrial Talc Products.

3.   J&J's failure to preserve its toxicology files on talc....................................... 41

4.   J&J's failure to preserve William Ashton's materials and records.............................. 41

5.   J&J's failure to preserve McCrone Associates' materials and records......................... 42

F.   Recent discovery in contemporary talc litigation has uncovered thousands of documents which reveal that the exculpatory statements that there was no evidence of asbestos in J&J/Windsor's Industrial Talc Products J&J routinely made to courts and asbestos claimants were materially false and misleading................................................................. 43

G.   J&J's fraudulent concealment and spoliation prevented Plaintiffs, Plaintiffs' decedent, and Class Members from discovering J&J's fraudulent activity despite the exercise of diligence, thereby warranting the tolling of any applicable statute of limitations.................... 45

V. CLASS ACTION ALLEGATIONS .......................................................................... 46

VI. CAUSES OF ACTION................................................................................................. 54

COUNT I: FRAUDULENT CONCEALMENT AND SPOLIATION .................................... 54

COUNT II: FRAUD AND DECEIT ................................................................................... 59

COUNT III: FRAUD UPON COURTS .............................................................................. 62

VIII. DEMANDS FOR RELIEF……………………………………………………………63

VIII. JURY DEMAND .................................................................................................. 65

# I.     INTRODUCTION

1.      This class action seeks declaratory, equitable, and legal remedies and relief for

thousands of asbestos claimants, who previously sued and whose cases were dismissed against

J&J, its wholly owned subsidiary, Windsor Minerals, Inc. ("Windsor"), and/or any third-parties

alleged to be legally responsible for Windsor's industrial talc ("Third Party"), for asbestos

personal injury damages caused by exposure to industrial talc products mined, milled, sold, and

distributed prior to January 6, 1989, by J&J, Windsor or its corporate predecessor. (Such talc ore

and resulting talc products involved in this matter and the class claims being made herein as

"J&J/Windsor Industrial Talc").

2.      This Action is not an asbestos injury case and does not seek to revive

claims of class members whose cases or claims relating to J&J/Windsor Industrial Talc

were wrongfully dismissed. Rather, it is an action about J&J's misconduct and fraud

upon litigants and courts while defending asbestos personal injury cases involving J&J/Windsor Industrial Talc in state and federal courts around the country. *See Williams v. BASF Catalysts LLC*, 754 F.3d 306, 311 (3d Cir. 2014).

3.      Thousands of cases were wrongfully dismissed, because J&J executives and representatives, including its in-house attorneys, falsely represented to courts and litigants that no evidence ever existed indicating that J&J/Windsor Industrial Talc contained asbestos. Accordingly, this Action seek redress for J&J's fraudulent concealment, spoliation, and fraud as described in this Complaint, which are independent torts under New Jersey law. *Id*. at 315.

4.      The representative Plaintiffs' deceased family member and all members of the putative Class filed such personal injury lawsuits seeking damages based upon exposure to J&J/Windsor Industrial Talc (**"Underlying Lawsuits"**). Each, however, was eventually forced to either: a) voluntarily dismiss the Underlying Lawsuit (sometimes under threat of frivolous litigation sanctions) while receiving no, or, at best, nominal consideration, or, b) alternatively, suffer an involuntary dismissal of the suit related to J&J/Windsor Industrial Talc when he/she could not proffer admissible evidence of asbestos in J&J/Windsor Industrial Talc.

5.      The inability to provide such evidence was not for a want of investigation or discovery efforts on the claimants' lawyers' part. Nor was it the result of unassailable scientific or physical fact that talc from Windsor's mines do not contain asbestos.[2] Rather, the dismissals of the Underlying Lawsuits were the result of a concerted, systematic, and multiple decades-long scheme of fraud, spoliation, and fraudulent concealment of evidence by J&J regarding the existence of asbestos in J&J/Windsor's Industrial Talc.

---

[2] The talc from Windsor's mines have been found to contain asbestos as described herein. *See* §IV.(A).

6.      The circumstances giving rise to this case began in or about the early 1970s when multiple sources, inside and outside of J&J, repeatedly advised J&J that the talc sold by its wholly owned subsidiary, Windsor Minerals, Inc., contained asbestos.

7.      During this time, Louis Edley unwittingly breathed in asbestos dust while working with and around J&J/Windsor Industrial Talc on a daily basis at Bird & Son in Perth Amboy, New Jersey.

8.      Rather than warn Louis Edley and tens of thousands of others like him, J&J went to great lengths to conceal the fact that it had been repeatedly advised that its talc contained asbestos.

9.      The plan to conceal evidence included editing test results and adopting testing methods designed to mask the presence of asbestos in samples conducted by and for J&J. Over time, reports began to appear in the press that talc often contained asbestos.

10.     Eventually, workers began to file lawsuits against J&J and Windsor alleging that they developed asbestos-related diseases, including cancer, because of their work with and around J&J/Windsor Industrial Talc.

11.     Instead of defending these cases on the merits, J&J routinely, systematically, and falsely represented to litigants, courts, and the public that there was no evidence whatsoever that its talc ever contained any amount of asbestos.

12.     In 1986, Louis Edley commenced a personal injury lawsuit in the Superior Court of New Jersey, Law Division, Middlesex Vicinage, against J&J's subsidiary, Windsor Minerals, Inc., under the caption *Louis Edley v. Windsor Minerals, Inc.*, et al., Docket No. MID-L-75913-86. The complaint alleged that Mr. Edley developed asbestosis because of his work with and around J&J/Windsor's Industrial Talc while working at Bird & Son's factory.

13.     As set forth in more detail below, J&J threatened Edley and his lawyer with monetary sanctions if they refused to consent to dismiss his case against J&J's subsidiary, Windsor Minerals, Inc. In so doing, J&J's in-house counsel represented to Edley's attorney that there was no evidence whatsoever that there was ever any amount of asbestos in the J&J's talc. Edley eventually relented and voluntarily dismissed his case against Windsor Minerals without receiving any compensation from J&J or Windsor.

14.     The dismissal of Louis Edley's case was not unusual. To the contrary, it is one of thousands of J&J/Windsor Industrial Talc cases that were filed and dismissed over nearly 50 years because of a deception which J&J and its attorneys, acting on its direction and behest, wrought on plaintiffs, their lawyers, and presiding courts across the nation about the presence of asbestos in J&J/Windsor's Industrial Talc, all with the intent and design to obtain or force the dismissal of all asbestos claims filed against J&J and Windsor.

15.     J&J carried out this deception in a universal plan to defraud plaintiffs and the courts through at least four (4) principal means:

(a) In violation of rules of the court and the law, J&J falsely claimed in discovery responses, sworn testimony, court filings, and other statements that there was no evidence, including any test results, reporting the presence of asbestos in its talc or talc products;

(b) J&J hid, destroyed, or discarded those tests, which in fact, showed the presence of asbestos in its talc in violation of its duty to preserve evidence and to turn over such evidence to plaintiffs and the courts;

(c) J&J devised and employed testing methods with the specific purpose of producing results incapable of detecting the presence of asbestos in talc samples from Windsor's mines,

including detecting it in samples that were, in fact, known by J&J to contain asbestos;" and

(d) J&J required or induced outside assay laboratories to use J&J's insensitive testing methods and thereafter use in their reports prescribed, deceptive language, in order to create and lead to the false conclusion that the Windsor talc did not contain any asbestos, even when asbestos had, in fact, been found in the samples.

16.    At all times material to this lawsuit, the integrity of the judicial system is founded upon the bedrock principle that the truth be spoken, evidence not altered or concealed, and the rules of court, including the discovery and disclosure rules, be obeyed and adhered to by all litigants and their counsel.

17.    As a result of J&J's misconduct, including its disregard of the rules of evidence and procedure, the duty of candor to adversaries and courts, and the obligations to preserve and not alter evidence, thousands of industrial workers and presiding courts were deprived of essential evidence needed to establish and adjudicate asbestos injury claims. Consequently, thousands of asbestos claims and cases against J&J and its subsidiary company, Windsor Minerals, Inc., or alleged Third Parties were dismissed, voluntarily or by court order, without full and fair compensation being paid to the asbestos injury claimants.

18.    After the dismissal of Mr. Edley's case and thousands of other Industrial Talc asbestos exposure suits against J&J, Windsor, and/or alleged Third Parties, a trove of evidence was uncovered in litigation over injuries alleged to have been caused by exposure to asbestos in J&J's talc products that exposed the lies in J&J's "no evidence of asbestos in our talc" defense. This evidence includes:

(a) Dozens of reports on J&J's talc-containing products that showed the presence of asbestos and the withholding of such information from litigants, courts, and the public;

(b) Internal J&J communications sharing the asbestos positive testing results, thereby proving knowledge of asbestos in its industrial talc products at the highest managerial levels within J&J; and

(c) Internal J&J communications regarding the development and implementation of a strategy to publicly discredit independent reports and studies showing the presence of asbestos in J&J's talc.

19.     Accordingly, this Action seeks to establish the existence, degree, duration, targets, victims, and effects of J&J's obstruction of justice and fraud upon the courts, and thereupon, obtain class-wide declaratory and equitable relief addressing the resulting injuries to the judicial process and corresponding abridgment of the economic, property, and personal rights of the members of the Class (**"Class Members"**) defined herein, including:

(a) A declaratory judgment that a fraud and/or fraudulent concealment and spoliation of material evidence relating to the existence of asbestos in J&J/Windsor's talc has been committed by J&J to the detriment of the Class Members;

(b) A determination of J&J's liability for compensatory and punitive damages to Plaintiffs and the Members of the Class relating to the fraud, fraudulent concealment, and spoliation of evidence relevant and material to establishing the dismissed J&J/Windsor Industrial Talc asbestos injury claims;

(c) A declaration, injunction, or decree imposing a constructive trust upon J&J's property and requiring J&J to render an accounting to the Court of all fees, revenues, costs,

insurance proceeds, and expense savings relating to Plaintiffs' and the Class Members'

dismissed asbestos injury claims;

(d) A determination and declaration of J&J's liability for disgorgement of revenues, profits,

and money unjustly earned, saved, retained, or received from the commission of the

frauds upon the courts, Plaintiffs, and Members of the Class and/or the commission of

proscribed activities described below, together with a determination and decree on the

disposition and distribution of such disgorgement;

(e) A determination and declaration of the need for and ordering execution of a pending

action notice program paid for by J&J, with such notice informing Class Members or

their representatives of: (1) the pendency of this Action, (2) J&J's alleged misconduct,

and (3) their rights against J&J;

(f) Such other and further relief in favor of the Plaintiffs and the putative Class as may be

available and just.

20.     For avoidance of any misunderstanding or doubt, the present lawsuit is _not_

asserting, directly nor indirectly:

(a) Any legal or equitable claim for relief or remedy relating to the manufacture or sale of

Johnson's Baby Powder or Shower to Shower products against or with respect to the

former or current Johnson & Johnson Consumer Inc. (**"JJCI"**) (formerly known as

Johnson & Johnson Baby Products Company, a New Jersey company incorporated in

1979 and wholly owned by J&J), nor against LTL Management, LLC (**"LTL Mgt."**).

This lawsuit is not seeking, directly or indirectly, any damages or equitable relief, for any

talc-related injury claims against JJCI or LTL Mgt., including any claims relating in any

way to talc or talc-containing materials that formerly were asserted against (or that could

have been asserted against) the former Johnson & Johnson Consumer Inc., formerly

known as Johnson & Johnson Baby Products Company (**"Old JJCI"**), on any theory of

liability (whether direct, derivative, joint and several, successor liability, vicarious

liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise). The

claims asserted are, therefore, not Enjoined Talc Claims as the term is defined in the

protective injunction and restraining orders entered in LTL Mgt.'s current Chapter 11

proceeding, as of the time of this Action's commencement.

(b)  Any legal or equitable claim for relief or remedy against the former or current Cyprus

Mines Corporation (**"Cyprus"**), Imerys Talc America, Inc. or Imerys Talc Vermont, Inc.

(collectively referred to herein as **"Imerys"**). This lawsuit is also not seeking, directly or

indirectly, any damages, equitable relief, declaratory judgment or any other relief against

Cyprus or Imerys.

21.     Rather, the claims in this case are brought under New Jersey law solely against

J&J for J&J's fraud, direct spoliation, and fraudulent concealment in defending personal injury

claims arising out of the Industrial Talc Products mined, milled, sold, and distributed by its

wholly owned subsidiary, Windsor, whether or not J&J was a named party in the prior

Underlying Lawsuits.

## II.      PARTIES

### A.      Plaintiffs

22.     Plaintiffs, Daniel Edley and Roger Edley (collectively as **"Edley"**), are citizens of

the State of New Jersey, with Daniel Edley residing at 191 Route 9 South, Unit 12, Englishtown,

New Jersey 07726 and Roger Edley residing at 482 Brookside Avenue, Laurence Harbor, New

Jersey 08879. At all times relevant herein, they are the sons of the late Laszlo "Louis" Edley, who died on July 27, 1994. They are also the personal representatives of Mr. Edley's Estate.

23.     Plaintiffs bring this suit in their individual capacity, as personal representatives of the Estate of Louis Edley, deceased, on behalf of said Estate, and as Class representatives of a Class of others similarly situated as defined below.

24.     Plaintiffs' decedent, Louis Edley, filed a lawsuit against Windsor claiming that he developed an asbestos disease as result of exposure to J&J/Windsor's Industrial Talc described more fully below at §IV.C.1.

25.     Due to J&J's fraudulent defense scheme, as it was practiced upon Plaintiffs' decedent, Louis Edley, and his lawyers, their father voluntarily dismissed his Underlying Lawsuit against Windsor without compensation by stipulation of dismissal dated July 23, 1987, and filed on August 17, 1987.

26.     Plaintiffs' decedent, Mr. Edley, while alive, did not know nor suspect that he had been a victim of the Defendants' fraudulent defense scheme described herein.

### B.     Defendant Johnson & Johnson

27.     Johnson & Johnson (**"J&J"**) is a New Jersey corporation formed in 1894. Today, J&J is a multi-national, multi-billion-dollar corporation with its principal executive offices located in New Brunswick, New Jersey.

28.     In 1965, J&J decided it wanted complete control of the source of talc for its products and decided to own and operate its own talc mines.

29.     In 1965, J&J acquired all of the assets of Eastern Magnesia Talc Co., Inc. (**"EMTCI"**), a Vermont corporation, including its talc mines, talc mills, and related facilities located in northern and southern Vermont. Since at least 1924, EMTCI and its predecessors had

12

been in the business of mining and processing talc ore into talc products, which were sold for personal cosmetic and industrial uses.

30.     In acquiring EMTCI in 1965, J&J agreed to pay, indemnify, and hold harmless the former EMTCI for all debts, obligations, contracts, and civil liabilities as they existed on the Closing Date of any kind, character, or description whether accrued, absolute, contingent, or otherwise, other than certain described exceptions not relevant to this Action.

31.     After the purchase of EMTCI, J&J's Vermont talc mines became the exclusive source for the talc used in J&J's cosmetic talc products. J&J also continued to sell Industrial Talc Products from its Vermont mines to industrial and manufacturing facilities throughout the United States for use in the manufacturing of roofing materials, rubber products, joint compound, and other applications.

32.     In 1967, J&J sold a portion of the Eastern Magnesia Talc ("**EMTAL**") business it had acquired from EMTCI to a third party. The portion sold included EMTCI's Johnson Vermont talc mine and Johnson Vermont talc mill located in northern Vermont, and the EMTAL industrial talc product lines (collectively the mine, mill, and product line J&J sold are referred to as the **"EMTAL Business"**).

33.     After the sale, J&J continued to operate the remaining talc mining and milling operation located in southern Vermont it had acquired in 1965.

34.     At the time of the sale of the EMTAL northern Vermont business assets in 1967, J&J changed the corporate identity of its subsidiary operating the southern talc mine and mill to Windsor Minerals, Inc, a Vermont corporation, a wholly owned subsidiary of J&J.

35.      From 1967 to 1989, J&J directly owned and controlled Windsor. Talc ore from underground mines, mills, and related facilities in southern Vermont, was marketed, distributed, and sold for industrial use until J&J sold the mining operations in 1989.

36.      J&J controlled all major decisions made by Windsor relating to the health and safety of J&J's talc products.

37.      J&J's in-house attorneys working directly for the General Counsel of J&J made all decisions concerning litigation involving the sale Windsor talc prior to January 6, 1989. **Exhibit 3** (10/29/1982 Deposition of Windsor President, Roger N. Miller, *Westfall v. Whittaker, Clark & Daniels, et al.*, C.A. #79-0269 (D. R.I.), 77:7-11).

38.      The talc ore from the Vermont mines was processed into talc powder, which was distributed and sold to third parties, for use in the manufacture and application of many industrial products, including roofing materials, plastics, paint, wall board, joint compound, and rubber goods.

39.      The J&J/Windsor Industrial Talc was actually marketed as an "asbestos substitute" for use in products like joint compound, and as a result, was installed in countless homes and offices throughout the United States.

40.      At all times relevant, J&J dictated the litigation strategies and actions of Windsor and its defense counsel which resulted in the unjust dismissal of lawsuits claiming injury from exposure to J&J talc.

41.      At all times material herein, Defendant J&J, acted by and through its officers, employees, servants, attorneys, agents, actual, apparent and/or ostensible, any and all of whom were then and there acting within the course and scope of their authority, duties, and employment, actual

or apparent. Among these employees and officers, were members of J&J's in-house legal department and ranking management members.

### C.     John/Jane Doe Defendants

42.     John/Jane Doe Attorneys 1-1000 are fictitiously named defendants who are members of J&J's in-house legal department or were outside counsel to J&J, (including law firms responsible for such counsel), their exact identities being currently unknown to Plaintiffs, who, either singularly, jointly and/or in concert with others knowingly or in reckless disregard for the truth made, implemented, aided or abetting, materially assisted and/or failed to stop or correct the scheme of false representations and fraudulent concealments described herein that, in words or effect, portrayed and represented to the public, to industrial purchasers, to asbestos claimants and their counsel, and to presiding asbestos courts, that no evidence existed indicating that J&J/Windsor Industrial Talc contained asbestos, and, as a result, thousands of industrial talc asbestos claimants' lawsuits were wrongfully dismissed without just compensation.

43.     John/Jane Doe J&J Corporate Members 1-1000 are fictitiously named defendants that are J&J's Directors, officers and/or employees, their exact identities being currently unknown to Plaintiffs, who either singularly, jointly and/or in concert with others, both inside and external to J&J, knowingly, or in reckless disregard for the truth, approved, directed, authorized, condoned, ratified, made, implemented, and/or failed to stop or correct the scheme of false representations and fraudulent concealments described herein that, in words or effect, portrayed and represented to the public, to industrial purchasers, to asbestos claimants and their counsel, and to presiding asbestos courts, that there was no evidence existed indicating that J&J/Windsor Industrial Talc contained asbestos, and, as a result, thousands of industrial talc asbestos claimants' lawsuits were wrongfully dismissed without just compensation.

15

### III. VENUE AND JURISDICTION

44.      Venue is proper in this Court because the events or omissions giving rise to the individual and Class claims occurred within the vicinage of this Court and Defendant is subject to personal jurisdiction in this State.

45.      J&J directed, controlled, and/or committed the unlawful and other tortious activities and omissions alleged and complained about herein from its headquarters here in the State of New Jersey, even though the impact and harm to many of the Class Members and their decedents may have occurred outside of New Jersey. This Court therefore has jurisdiction over the parties and claims herein.

### IV.     FACTS COMMON TO CLASS CERTIFICATION AND ALL COUNTS

**A.      By the early 1970s, J&J knew of the presence of asbestos in Windsor Minerals talc.**

46.      At all times relevant hereto, J&J understood the dangers posed to human health by asbestos exposure and that asbestos was a known contaminant of talc.

47.      J&J's management was sophisticated in the mineralogy of talc and understood its connection to asbestos. J&J further understood that asbestos appeared in talc in multiple forms.

48.      Internally, J&J defined "asbestos" as "the fibrous serpentine chrysotile and the fibrous forms of … anthophyllite, … tremolite, and actinolite." **Exhibit 4** (8/16/2018 Deposition of Dr. John Hopkins, Ph.D., (Vol. 1), J&J Corporate Representative, MDL No. 16-2738, (D. N.J.), 174:24–175:23). These forms of the listed minerals have needle-like crystalline structures, which are a threat to human health.

49.      On April 15, 1969, Dr. T.M. Thompson, M.D., then the Medical Director for J&J, wrote to Mr. William H. Ashton, a J&J executive supervising the company's talc-based products, to

16

advise him of the danger posed by the "inhalation" of the "spicule" or "needle-like" crystals of tremolite in J&J's talc. *See* **Exhibit 5** (JNJ000087991, J&J 4/15/1969 Letter from Dr. T.M. Thompson to W. Ashton re: Alternate Domestic Talc Sources – Project Code #101). Dr. Thompson recommended that "since pulmonary diseases, including inflammatory, fibroplastic, and neoplastic types, appear to be on the increase, it would seem prudent to limit any possible content of tremolite in our powder formulations to an absolute minimum." *Id*.

50.     Although Dr. Thompson stated that he was not aware of "any litigation involving either skin or lung penetration by our talc formulations," he cautioned Mr. Ashton that "since the usage of these products is so widespread, and the existence of pulmonary disease is increasing, it is not inconceivable that [J&J] could become involved in litigation in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations." *Id*. To that end, Dr. Thompson recommended that "someone in the Law Department should be consulted with regard to the defensibility of our position in the event that such a situation could ever arise." *Id*.; *See also* **Exhibit 6** (2/15/2019 Deposition of Nancy Musco (Vol. 1), J&J Corporate Representative, *Foley v. Avon Products, Inc., et al.*, No. MID-L-3095-18 (N.J. Law Div.), 64:18–68:1).

51.     Dr. Thompson further forewarned Mr. Ashton that J&J could confront a situation where the company would be compelled to remove talc from its products "if it became known that our talc formulations contained any significant amount of Tremolite." *See* **Exhibit 5** (JNJ000087991, 4/15/1969 J&J Letter from Dr. T.M. Thompson to W. Ashton re: Alternate Domestic Talc Sources – Project #101).

52.     In July 1971, J&J's managers reported a conversation with Dr. Clark Cooper, a professor at the School of Public Health at the University of California, Berkeley. Dr. Cooper

expressed his concern that there is no place for asbestos in talc and any talc with asbestos should be removed from the market. **Exhibit 7** (7/30/1971 J&J Letter from Dr. G. Hildick-Smith to Dr. R.A. Fuller).

53.      In 1971, J&J retained the Mount Sinai School of Medicine to privately test its talc. Mt. Sinai School of Medicine's School of Environmental Science reported that there was, in fact, asbestos in the talc to J&J's Director of Clinical Research, Dr. Gavin Hildick-Smith. *See* **Exhibit 8** (11/10/1971 Mt. Sinai Letter from Dr. A.M. Langer to Dr. G. Hildick-Smith), and, **Exhibit 10** (J&J Meeting with Dr. Langer on July 9 Concerning Analytical Analysis of Talc).

54.      In 1972, J&J hired Professor Thomas Hutchinson from the University of Minnesota Space Science Center to assay its talc. In testing it, he found "incontrovertible asbestos" in J&J's talc. *See* **Exhibit 11** (Handwritten Notes, Talc Testing Analytical Results, and Photomicrographs by Professor Hutchinson). Thereafter, Professor Hutchinson provided J&J with a formal report documenting his findings with photographs of the asbestos he found in the talc. *See* **Exhibit 11**, and, **Exhibit 12** (University of Minnesota Space Science Center - Investigation of Possible Asbestos Contamination in Talc Samples).

55.      Although J&J had Professor Hutchinson's results identifying chrysotile asbestos in its talc, J&J nevertheless told the FDA that Professor Hutchinson did not find any asbestos in the J&J talc that he tested. *See* **Exhibit 12**; *See also* editing out chrysotile asbestos results on pg. 6 of **Exhibit 14** (6/21/1973 McCrone Letter and 6/22/1973 Report from Ian Stewart to Dr. A. Goudie).

56.      In 1972, J&J Research Director, Dr. Wilson Nashed, confirmed that Walter C. McCrone Associates, Inc. (**"McCrone"** or **"McCrone Associates"**), a testing company frequently used by J&J, found tremolite in the J&J talc. He acknowledged that these findings are "not new." **Exhibit 15** (J&J Handwritten Note from Dr. W. Nashed to Dr. A. Goudie).

18

57.     On May 1, 1973, Roger N. Miller, then the President of J&J's mining company, Windsor, informed Dr. Dewitt Petterson of J&J that "the ore body contains actinolite." **Exhibit 16** (5/1/1973 Windsor Memo from Roger N. Miller to Dr. D. Petterson re Memo-D. Hamer-4/19/73-Dispersion Straining, etc.).[3]

58.     One week later, on May 8, 1973, J&J's chief talc scientist, William Ashton, informed Dr. Dewitt Petterson that "[t]he first showing of actinolite we know about is October 1972." **Exhibit 17** (5/8/1973 J&J Memo from W. Ashton to Dr. D. Petterson).

59.     Similarly, in March of 1974, Professor R.C. Reynolds at Dartmouth College's Department of Earth Sciences, provided information to J&J that "Actinolite is the dominant fiber form amphibole in the ore and talc product provided by Windsor Minerals." **Exhibit 18** (JNJ 000266903, 3/1974 Dartmouth College Memo from R.C. Reynolds to Windsor re: Analysis of Talc Products and Ores for Asbestiform Amphiboles).

60.     McCrone Associates, and the Colorado School of Mines Research Institute also tested J&J's talc and its source mines. All of these testing laboratories, among others, found asbestos minerals in J&J's source mines.[4]

---

[3] Roger Miller was the President of Windsor Minerals until his retirement in January of 1989 **Exhibit 91** (6/12/1991 Deposition of Roger Miller, *Cunningham v. Owens-Corning Fiberglass Corp., et al.*, No. 88-826653 NP (Mich. Cir. Ct. Wayne Cty.), 7:7-10.) Roger Milled died in December of 2012.

[4] *See, e.g.* **Exhibit 58** (4/14/1971 Colorado School of Mines Research Institute Letter to J&J); **Exhibit 59** (10/27/1972 McCrone Report); **Exhibit 60** (2/26/1973 Colorado School of Mines Institute to W. Ashton of Johnson & Johnson re: Mineralogical Exam of Five Talc Samples); **Exhibit 62** (2/11/1974 McCrone to Dr. F.R. Rolle); **Exhibit 63** (4/10/1974 McCrone to JJ Russell); **Exhibit 64** (4/24/1974 McCrone Report); **Exhibit 65** (4/27/1973 Microscopic Exam of Johnson's Baby Powder); **Exhibit 66** (5/8/1974 McCrone Report); **Exhibit 67** (7/8/1974 McCrone to Dr. R.R. Rolle); **Exhibit 68** (10/10/1974 McCrone to Windsor Minerals, Inc.); **Exhibit 69** (12/9/1974 McCrone to J&J); **Exhibit 70** (7/1/1975 McCrone to Windsor Minerals,

61.     The following chart (depicted as *Figure 1* below), which a J&J corporate

representative acknowledged is accurate, summarizes the J&J testing finding asbestos in J&J talc

from 1965 through 1989[5]:


[Balance of page intentionally blank]

---

Inc.); **Exhibit 71** (8/31/1976 J&J Memo re: Vermont 66 Talc); **Exhibit 72** (9/11/1975 I. Stewart
to V. Zeitz); **Exhibit 73** (11/5/1975 McCrone to Windsor Minerals, Inc.); **Exhibit 74**
(11/19/1975 McCrone to Windsor Minerals, Inc.); **Exhibit 75** (7/5/1976 Colorado School of
Mines Research Institute Report); **Exhibit 76** (1/25/1977 Dr. F.D. Pooley to Dr. F.R. Rolle);
**Exhibit 77** (4/1/1977 EMV Report to J&J); **Exhibit 78** (10/5/1978 McCrone to Windsor
Minerals, Inc.); **Exhibit 79** (2/9/1979 Handwritten Notes re Conversation with Harold Cohen);
**Exhibit 80** (11/6/1980 McCrone to Windsor Minerals, Inc.); **Exhibit 81** (8/22/1985 McCrone to
Windsor Minerals, Inc.); **Exhibit 82** (4/29/1986 McCrone to Windsor Minerals Inc.); **Exhibit 83**
(3/25/1992 Interoffice Memo by Munro); **Exhibit 43** (12/4/1997 Bain Environmental Report);
**Exhibit 84** (5/23/2002 Luzenac America Inc. (hereinafter **"Luzenac"**) Technical Report);
**Exhibit 85** (2/26/2004 Luzenac Product Certification Report); **Exhibit 86** (2/27/2004 Luzenac -
Product Certification); **Exhibit 87** (3/4/2011 Summary of TEM Asbestos Results: Grade 66/96
USP Product Composites).

[5] **Exhibit 89** (8/14/2019 Testimony of Dr. John Hopkins, Ph.D. (Vol. 1 of 2), J&J Corporate
Representative, *Barden* Trial Transcript, 117:17-118:24).

*Figure 1*

**J&J's Internal Documentation 1968-1972**

| Date | Organization | Ore/Product | Type |
|---|---|---|---|
| 1/24/68 | Battelle Memorial | Italian Source Talc | Tremolite |
| 5/10/71 | Colorado School of Mines | Johnson's Baby Powder | Tremolite needles |
| 7/7/71 | Colorado School of Mines | Vermont Production Samples | Tremolite/Actinolite x 6 |
| 7/9/71 | Dr. Langer-Mt. Sinai | Johnson's Baby Powder | Chrysotile |
| 7/23/71 | Colorado School of Mines | Vermont Talc | Amphiboles |
| 8/6/71 | Johnson & Johnson | Italian Talc | Tremolite, Actinolite & Chrysotile |
| 8/9/71 | Johnson & Johnson | Johnson's Baby Powder | Fines implicated in asbestos toxicology |
| 9/3/71 | McCrone | Johnson's Medicated Powder | Chrysotile |
| 11/10/71 | Dr. Langer-Mt. Sinai | Johnson's Baby Powder | Chrysotile |
| 2/72 | Turin Polytechnic | Italian Source Talc | Tremolite |
| 9/8/72 | Prof. Pooley-Cardiff | Italian Source Talc | Tremolite |
| 10/27/72 | McCrone | Johnson's Baby Powder "108T" | Tremolite |
| 10/27/72 | McCrone | Johnson's Baby Powder "108T" | Tremolite |
| 1/9/2 | Johnson & Johnson | Johnson's Baby Powder | Tremolite |
| 1/9/2 | Minnesota Space Center | Shower to Shower/ Lewin Shower/Shower | Chrysotile x 2 |

PLAINTIFF'S TRIAL EXHIBIT 3695-83

**J&J's Internal Documentation 1973-1974**

| Date | Organization | Ore/Product | Type |
|---|---|---|---|
| 4/19/73 | Johnson & Johnson | Johnson's Baby Powder | Tremolite Fibers x 4 |
| 4/27/73 | Johnson & Johnson | Johnson's Baby Powder (further analysis) | Actinolite Rods |
| 5/16/73 | Prof. Pooley - Cardiff | Vermont Source Talc | Tremolite type asbestos |
| 6/4/73 | Prof. Pooley-Cardiff | Vermont Talc | Tremolite |
| 10/29/73 | Johns Manville | Italian Source Talc | Tremolite |
| 10/29/73 | Johns Manville | Johnson's Baby Powder | Chrysotile |
| 9/13/73 | Prof. Pooley-Cardiff | Vermont Talc | Actinolite |
| 9/13/73 | Prof. Pooley-Cardiff | Italian Talc | Tremolite |
| 12/13/73 | Dutch Consumer Organization | Johnson's Baby Powder | Asbestos |
| 1974 | Pooley/Langer | Italian Source Talc | Tremolite & Possible Anthophyllite |
| 3/1974 | Dartmouth-Professor Reynolds | Vermont Source Talc | Fiberform actinolite and anthophyllite |
| 5/14/74 | Windstor Minerals/JJ | Vermont Source Talc | Chrysotile x 4 |
| 5/14/74 | Windstor Minerals/JJ | Vermont Source Talc | Fibrous Anthophyllite |

PLAINTIFF'S TRIAL EXHIBIT 3695-84

**J&J's Internal Documentation 1975-2004**

| Date | Organization | Ore/Product | Type |
|---|---|---|---|
| 11/19/75 | McCrone | Vermont Source Talc | Asbestiform Amphiboles x 2 |
| 3/1976 | Rubino, et al. | Italian Source Talc | Fibers of Tremolite |
| 9/26/84 | Paoletti, et al. | Italian Talc | Tremolite Asbestos x 7 |
| 9/26/84 | Paoletti, et al. | Italian Talc | Chrysotile Asbestos x 1 |
| 1/30/87 | Johnson & Johnson | Vermont Floated Talc | Amphiboles |
| 1/30/87 | Johnson & Johnson | Johnson's Baby Powder | Amphiboles |
| 3/30/87 | Johnson & Johnson | Vermont Floated Talc | Amphiboles |
| 1990 | McCrone | Vermont Talc | Anthophyllite Asbestos |
| 1991 | Alice Blount, Rutgers | Johnson's Baby Powder & Vermont Talc | Tremolite Asbestos |
| 2/10/92 | Alice Blount, Rutgers | Johnson's Baby Powder & Vermont Talc | Blount reiterates Asbestos findings |
| 10/13/95 | RJ Lee Group | Johnson's Baby Powder | Tremolite |
| 4/23/98 | Alice Blount, Rutgers | Johnson's Baby Powder & Vermont Talc | Blount reiterates Asbestos findings |
| 1/5/04 | Forensic Analytical Services | Johnson's Baby Powder | Anthophyllite Asbestos |

PLAINTIFF'S TRIAL EXHIBIT 3695-86

**J&J's Internal Documentation 1974-1975**

| Date | Organization | Ore/Product | Type |
|---|---|---|---|
| 4/4/74 | Johnson & Johnson | Vermont Source Talc | Fibrous Tremolite |
| 4/4/74 | Johnson & Johnson | Vermont Source Talc | Fibrous Chrysotile |
| 4/24/74 | McCrone | Vermont-Argonaut | Chrysotile x 15 |
| 4/24/74 | McCrone | Vermont-Argonaut | Asbestiform Amphibole x 15 |
| 5/9/74 | McCrone | Vermont-Argonaut Ore | Chrysotile asbestos contamination |
| 5/9/74 | McCrone | Vermont-Argonaut Product | Chrysotile asbestos contamination |
| 7/8/74 | McCrone | Vermont-Weekly Samples | Chrysotile x 5 |
| 7/8/74 | McCrone | Vermont-Weekly Samples | Tremolite fiber |
| 1974 | Società Talco e Grafite Val Chisone | Italian Source Talc | Chrysotile |
| 7/1/75 | McCrone | Vermont Source Talc | Asbestos x 9 |
| 11/5/75 | McCrone | Vermont Source Talc | Asbestos x 13 |

PLAINTIFF'S TRIAL EXHIBIT 3695-85

**B.**   **J&J created and utilized testing protocols designed to prevent the detection of asbestos present in samples and required certain words to be employed in reporting results to create the false impression that there was no asbestos in J&J's talc.**

62.      J&J responded to its internal testing showing its talc was contaminated with asbestos by developing a means of testing and reporting analysis results of talc samples that would not find or reveal asbestos even if present in the samples, which it would then use as proof in asbestos injury claims that J&J's talc was asbestos free. The testing method, called J4-1, utilized X-ray diffraction (**"XRD"**) as an initial screen to determine if any further testing was necessary. **Exhibit 19** (10/7/1976 CTFA Method J4-1 Part I & Part II). If an XRD test result was negative, no more testing would occur, and the sample would be reported as "none detected." J&J knew that XRD testing lacked the sensitivity to detect the low levels of asbestos previously reported, but still not disclosed, in its talc. In short, this testing process virtually guaranteed that low levels of asbestos would never be found in J&J's talc.

63.      J&J similarly knew that XRD could not detect chrysotile asbestos at levels below two or three percent (2 or 3%) of the talc product and was also incapable of detecting low levels of tremolite asbestos, both of which were found in earlier tests of J&J's talc. **Exhibit 20** (2/19/2019 Deposition of Dr. Susan Nicholson, M.D., (Vol. 1), *Foley v. Avon Products, Inc., et al.*, No. MID-L-3095-18 (N.J. Law Div.), 196:19-198:8).

64.      Pursuant to the J4-1 protocols, if an XRD screening test result was positive, the sample would then have been analyzed using polarized light microscopy (**"PLM"**). Scientifically reliable PLM analysis required the analyst to count all asbestos fibers seen in a sample. But J&J's J4-1 testing protocol excluded asbestos fibers shorter than a defined size from the count. **Exhibit 19** (10/7/1976 CTFA Method J4-1 Part I & Part II). Although excluded from the count pursuant to J4-1 protocols, short asbestos fibers are carcinogenic.

65.     In arriving at the J4-1 method, J&J verified that the protocol would fail to detect the presence of asbestos fibers in its talc samples by spiking samples with known quantities of asbestos. The testing of the J&J samples spiked with asbestos demonstrated that the J4-1 method would not find asbestos in the talc eighty-six percent (86%) of the time even when asbestos was intentionally added. **Exhibit 9** (5/17/1977 Cosmetic, Toiletry, and Fragrance Association (**"CTFA"**) Meeting Minutes).

66.     At the same time J&J was designing and implementing the J4-1 testing protocol, its consultants advised J&J that there were better testing methods, which would find asbestos contamination, if it existed.

67.     One of those methods was the "pre-concentration" method, a process shared with J&J by the Colorado School of Mines Research Institute, Professor Dr. Fred D. Pooley of Cardiff University, and Rutgers University.[6]

68.     Because the sensitivity of the pre-concentration method would accurately reveal the presence of asbestos in talc samples, J&J rejected its use as contrary to "[J&J's] worldwide company interest." **Exhibit 21** (JNJAZ55_00001892, 5/16/1973 J&J Memo from Dr. F.R. Rolle to

---

[6] **Exhibit 90** (JNJ 000268037, 12/27/1973 Colorado School of Mines Research Institute Report, Prepared for J&J re A Procedure to Examine Talc for the Presence of Chrysotile and Tremolite-Actinolite Fibers); **Exhibit 61** (JNJAZ55_000005081, 6/6/1973 J&J Memo from Dr. F.R. Rolle to Dr. F.D. Pooley); **Exhibit 24** (06/12/1991 Deposition of Roger Miller in Cunningham, et al. v. Owens-Corning, et al) ("a concentration technique is mandatory because it brings the amphiboles into a reasonable concentration range for optical or other methods of analysis."); **Exhibit 25** (JNJNL61_000007330, Special Talc Studies Monthly Report, 3/1974, Assay Methods for Asbestos Minerals in Talc); **Exhibit 88** (JNJ 000250919, 3/11/1974 J&J Memo from Dr. J.P. Schelz to Dr. F.R. Rolle re Methods of Concentration of Asbestos in Talc-Project #0503-00); **Exhibit 53** (JNJNL61_000062964, 11/26/1974 J&J Memo from Dr. J.P. Schelz to Dr. F.R. Rolle re Review of Experimental Techniques for the Concentration of Asbestos Minerals in Talc – Project #0503-00) (collectively referred to as "concentration method").

Dr. T.H. Shelley re Proposed Specs for Analyzing Talc for Asbestos). **Exhibit 22**

(JNJNL61_000062953, 2/18/1975 J&J Limited Letter from Dr. F.R. Rolle to J&J).

69.     J&J's consultants also urged it to use a Transmission Electron Microscope

(**"TEM"**) to test for asbestos, as it was far more sensitive and effective than the J4-1 method used by

J&J. *See, e.g.*, **Exhibit 23** (JNJNL61_000006726, J&J 5/18/1973 Memo from G.E. Heinze to W.

Ashton et al., re Talc Symposium - 5/18/1973 - Department of the Interior).

70.     J&J eventually began to use TEM on a very limited basis, but also adopted a

reporting methodology called, TM7024, that it knew would yield negative results (*i.e.*, no asbestos)

even in samples where asbestos was present. Under the TM7024 method, J&J's scientists were

directed to evaluate only ten percent (10%) of an available sample. And even when asbestos was

found looking at ten percent (10%) of the sample, J&J's scientists still reported the tests as negative

and "not quantifiable" unless five (5) or more asbestos fibers of the same variety were counted.

**Exhibit 26** (JNJNL_000005032, 5/21/1995 J&J TM7024 TEM Analysis of Talc for Asbestiform

Minerals). Thus, even if the examiner counted as many as sixteen (16) asbestos fibers (*i.e.*, four (4)

fibers of each type, including tremolite, actinolite, anthophyllite, and chrysotile) using the TM7024

method, the resulting assay would be reported as not finding asbestos or "not quantifiable."

71.     J&J's position on the scientific propriety of its TM7024 testing protocol was and

remains inconsistent with those of environmental and health agencies, including the United States

Environmental Protection Agency (**"EPA"**). **Exhibit 27** (4/20/2006 U.S. EPA Region IX Response

to November 2005 R.J. Lee Group, Inc.).

72.     Further reducing the likelihood of detecting asbestos in its talc ore, J&J required

the use of the J4-1 testing method on only a composite sample drawn from every two (2) silos of talc

(each silo containing hundreds of tons of talc), TM7024 testing only quarterly from a composite

24

sample drawn from all siloed talc, and a monthly composite of "float feed" talc undergoing a type of processing. **Exhibit 28** (JNJMX68_000002913, 10/4/1984 J&J Memo from J.A. Molnar to Dr. B. Semple re Evaluation Program for Talc).

73.      Consequently, the total amount of talc J&J ever put under a microscope to test for asbestos was approximately 1/100 of a breath mint by weight. **Exhibit 29** (1/29/2020 Testimony of Matthew Sanchez (Vol. 1 of 2), *Barden v. Brenntag North America, et al.*, MID-1809-17 (N.J. Law Div.), Trial Transcript, 134:19-135:20.).

74.      Even though J&J tested minuscule amounts of talc product, and utilized methods specifically designed to yield negative (absence of asbestos) results at low levels, J&J nevertheless still found asbestos in its talc. **Exhibit 30** (11/5/2018 Deposition of Dr. John Hopkins (Vol. 4), *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation,* No. 16-2738, Exhibit of "Hopkins 28", Chart of various J&J testing results). When that occurred, J&J had internal policies to suppress and conceal such positive findings of asbestos in its talc.

75.      When asbestos was found, J&J required and implemented the strategy of using misleading "language" in formal reports, such as "not quantifiable" or "no quantifiable amount" of asbestiform minerals to cover up the positive asbestos findings, which J&J in turn reported as negative for asbestos in its talc.

76.      For instance, on August 22, 1985, McCrone Associates reported that "[c]hrysotile asbestos was detected" in two (2) samples of Windsor talc. **Exhibit 31** (8/22/1985 McCrone Letter to Arthur LaPierre, Safety, Health and Training Director at Windsor re: McCrone Project No. ME-1862). When Windsor's President Roger N. Miller learned of the report, he wrote to McCrone admonishing: "We received on August 22, the enclosed report on these samples mailed to another

Company employee. The August 22, report is couched in substantially different language than earlier reports. As I explained to you on my visit to Chicago it is very important that specific language be used." **Exhibit 32** (9/10/1985 Windsor Letter from Roger N. Miller to Ian Stewart re: Methodology and Reports). *Figure 2* reproduces the letter below:

*Figure 2*

77.     After receiving the letter from Windsor's President, Roger N. Miller, McCrone Associates issued a new report regarding the same talc samples but omitted the statement of positive asbestos findings. Instead, McCrone used J&J's misleading "language" indicating that it "did not find any quantifiable amount of asbestiform minerals in any of the samples[,]" which was intended to create the false impression of a negative test result for asbestos. **Exhibit 33** (10/8/1985 McCrone Letter to Roger N. Miller re: McCrone Project No: ME-1862).

### C.     J&J made material misrepresentations to courts and litigants for more than 40 years.

#### 1.     *Edley v. Windsor Minerals Inc., et al.*, No. MID-L-075913-86 (N.J. Law Div.).

78.     On August 4, 1986, Plaintiffs' decedent, Louis Edley, filed a lawsuit against Windsor and other potentially responsible parties in the Superior Court of New Jersey, Law Division, Middlesex Vicinage, New Jersey, under Docket No. MID-L-075913-86. Mr. Edley alleged that he developed asbestosis as a result of working with J&J/Windsor's Industrial Talc.

79.     On August 27, 1986, John N. Beidler, Esq., an attorney with J&J's Office of General Counsel and someone who possessed the information as well as access to all the documents in J&J's possession evidencing the presence of asbestos in J&J/Windsor's talc referenced above, wrote to Plaintiffs' decedent (Louis Edley)'s attorney, Ronald B. Grayzel, Esq. demanding a dismissal of Edley's lawsuit against Windsor, claiming that "no evidence of the presence of asbestos" in any of J&J's/Windsor's talc "has ever been revealed", and citing New Jersey's frivolous lawsuit statute as a veiled threat. *See* **Exhibit 1** (8/27/1986 J&J Letter from John Beidler, Esq., to Ronald Grayzel, Esq., re: *Edley v. Windsor Minerals, Inc.,* No. MID-L-075913-86 (N.J. Law Div.)). *Figure 3* reproduces the letter below:

*Figure 3*

---

Johnson&Johnson

OFFICE OF
GENERAL COUNSEL

ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, N.J. 08933 · 7002

August 27, 1986

Ronald B. Grayzel, Esq.
Levinson, Conover, Axelrod, Wheaton & Grayzel
Lincoln Plaza
2 Lincoln Highway, P.O. Box 2905
Edison  NJ  08818-2905

Re: Edley v. Windsor Minerals Inc.

Dear Mr. Grayzel:

As you may know, Windsor Minerals Inc. is a wholly-owned
subsidiary of Johnson & Johnson and, accordingly, the Summons
and Complaint in the above-captioned matter has recently been
referred to my attention.

Please be advised that Windsor Minerals Inc., contrary to the
allegation in the Complaint, does not now engage and never has
engaged in the manufacture or supply of "asbestos-containing
products". Rather, the exclusive business of Windsor Minerals
Inc. is and has been the mining and milling of talc from a
single mining district in Windsor, Vermont. That mining
district is the exclusive source of talc for all of the
Johnson's Baby Powder sold in the United States as well as a
source of pure talc sold to independent industrial users. All
of the talc mined by Windsor Minerals Inc., whether ultimately
sold to industrial users or used in Johnson's Baby Powder, is
sampled and tested for the presence of asbestos and no evidence
of the presence of asbestos in any Windsor Minerals product has
ever been revealed. Under the circumstances, there obviously
can be no reasonable knowledge, information or belief which
provides good ground to support this pleading under R1:4-8.

Parenthetically, we received a Complaint several months ago
filed by the Wysoker firm here in New Brunswick on behalf of
another former employee of Bird & Son and, upon being told the
forgoing facts, the plaintiff's attorneys immediately forwarded
to me a dismissal of the action as to Windsor Minerals Inc.

28

-2-

I am hopeful that you and your client will appreciate that there is no benefit to keeping Windsor Minerals in this case, from which in all fairness it should be dismissed and, I hope that this matter can be resolved as expeditiously as was the prior case.  In the event that you require an affidavit confirming the forgoing facts, please let me know.

May I hear from you promptly?

Very truly yours,

John N. Beidler

/rd

80.     When Edley's counsel, Ronald Grayzel, Esq., did not immediately dismiss the case against J&J's Windsor subsidiary, J&J made an additional effort to convince Edley to dismiss his case. On July 23, 1987, J&J drafted and provided an affidavit from Roger N. Miller, then the president of J&J's subsidiary, Windsor Minerals, Inc., using the **exact same language** Mr. Beidler, Esq., of J&J's Office of General Counsel, originally used in his letter to Edley's attorney, Mr. Grayzel, Esq., urging Edley to dismiss his case against Windsor. *See* **Exhibit 34** (7/23/1987 Letter from R. Levitt, Esq., to R. Grayzel, Esq., attaching Roger N. Miller Affidavit).

81. To support J&J's representations that there was "no evidence" of asbestos in J&J/Windsor's talc, J&J provided a February 2, 1987 McCrone report on an assay of J&J's talc. The report used the J&J's misleading "language" indicating that there was "no quantifiable amounts of asbestiform minerals" in J&J/Windsor's talc samples. *Id.* (**Exhibit 34**).

82. J&J's statements (which Beidler prepared and made to claimants, their attorneys and tribunals as an officer of the court representing J&J's Office of General Counsel, were knowingly and intentionally false, and, were purposely crafted to induce Edley to dismiss his case against Windsor. J&J knew of the positive test results findings of asbestos in J&J/Windsor's talc when denying to plaintiff's counsel there was any evidence of asbestos in the J&J/Windsor's Industrial Talc.

83. Throughout this effort to convince Edley and his attorney to drop the case, J&J never referenced or provided any of the other testing reports in the possession of J&J, which found asbestos in J&J/Windsor's talc.

84. In order to further induce Edley to drop his case against Windsor, J&J's August 27, 1986 letter from John Beidler, Esq., references as precedent another case dismissed two months earlier, of a plaintiff who also worked at Mr. Edley's employer, based upon the same false representations. **Exhibit 1** (8/27/1986 J&J Letter from John Beidler, Esq., to Ronald Grayzel, Esq., re: *Edley v. Windsor Minerals, Inc.*).

85. On or about August 17, 1987, Louis Edley filed a voluntary dismissal of his lawsuit against Windsor. In doing so, he reasonably relied and acted on the misrepresentations and material omissions made by J&J to his attorney, Ronald Grayzel, Esq. *See*, *e.g.*, **Exhibit 38** (*Edley* Stipulation of Dismissal re R.B. Grayzel, Esq.); **Exhibit 37** (10/10/1986 Windsor's Filed Answer re *Yuhas*, and, 1/13/1987 *Yuhas* Filed Stipulation of Dismissal). As a result, Louis Edley was deprived

of the fair opportunity to pursue his claims with evidence of the most essential fact in any asbestos case—proof that the product contained asbestos—and to litigate his claims on an even playing field in a fair judicial proceeding in pursuit of full, fair, and adequate compensation for his injuries.

### 2. Thousands of fraudulent dismissals followed in the 1980s and 1990s.

86.     By the end of 1989, there were more than 1,000 cases filed and pending, which alleged that J&J/Windsor's talc caused asbestos-related disease in industrially exposed workers.

87.     Plaintiffs and their counsel's investigation, to date, has found numerous false sworn discovery responses as well as affidavits similar to that used to secure dismissals in the *Edley* and *Yuhas* cases authored and submitted by J&J that were verified or sworn to by Windsor President Roger N. Miller or other J&J/Windsor executives and prepared and served by the John Doe Attorneys representing J&J/Windsor.

88.     As illustration, on July 8, 1988, a year after representing no evidence existed of asbestos in J&J talc in the *Edley* case, J&J drafted and filed an affidavit from Windsor President Roger N. Miller attesting:

> All of the talc mined by Windsor Minerals, Inc. has been regularly sampled and tested for the presence of asbestos. ***No evidence of the presence of asbestos*** in Windsor Mineral, Inc.'s product ***has ever been revealed*** by this testing.

**Exhibit 39** (7/8/1988 Affidavit of Roger N. Miller, *Andonian v. A.C. & S, Inc.*, No. ACV-88-6-1731 (Summit Cnty. Ct. Ohio Comm. Pls.)) (emphasis added).

89.     On the same date in another asbestos case, J&J prepared and submitted another affidavit by Windsor President Miller again swearing:

> All of the talc mined by Windsor Minerals, Inc. has been regularly sampled and tested for the presence of asbestos. ***No evidence of the presence of asbestos*** in Windsor Mineral, Inc.'s [product] ***has ever been revealed*** by this testing.

**Exhibit 40** (7/8/1988 Affidavit of Roger N. Miller, *Miller v. A.C. & S, Inc.*, No. ACV884-1087

(Summit Cnty. Ct. Ohio Comm. Pls.)) (emphasis added).

90.     These false representations achieved their goals. The plaintiffs receiving these

materials dismissed their cases against J&J or Windsor. Stipulations of dismissals from those cases

are attached hereto as **Exhibit 41 (**Summit County Ohio Asbestos Litigation Windsor Minerals

Dismissal Order, (N.D. Ohio)).

### 3.     *Durham v. Metropolitan Life Ins. Co.,* **No. 05C-07-136 ASB (Del. Sup. Ct. New Castle Cnty.)**

91.     Nearly twenty years after the *Edley* case was dismissed based upon J&J's "no

evidence of the presence of asbestos" representation, J&J corporate representative, Dr. John

Hopkins, Ph.D., executed a similar affidavit in the Delaware State Court matter of *Durham v.*

*Metropolitan Life Ins. Co.*, No. 05C-07-136 ASB (Del. Sup. Ct. New Castle Cnty.). There, under

oath, Dr. Hopkins stated the following:

(a) "The conclusion of the Audits was that for both of the Italian and Vermont mines, there was
    ***zero evidence*** of asbestos in the geology and mineralogy of the mines."

(b) "For the talc sources in use in the United States over the period 1955-2002, there has ***never***
    ***been an instance*** of asbestos contamination."

(c) "**No evidence** of asbestos in the mineralogy and geology in the talc mines supplying Johnson
    & Johnson in the United States."

(d) "**No evidence** of asbestos contamination in each production batch sampling as certified by the
    suppliers, from the period 1975 – date."

(e) "It may be concluded that there has never been asbestos contamination of the talc used by
    Johnson & Johnson in the United States from the period in question, 1955-2002."

**Exhibit 42** (09/14/2006 Affidavit of Dr. John Hopkins, Ph.D., J&J Corporate Representative,

*Durham v. Metropolitan Life Ins. Co.*) (emphasis added).

92.        Dr. Hopkins identified Dr. Fred D. Pooley of Cardiff University, a consultant to

J&J in the 1970s and 1980s, as one who reported to J&J "zero evidence" of asbestos in the Vermont

mines. (*Id.* at 3).

93.        Evidence discovered years later, however, proves unequivocally that Dr.

Hopkins's representations concerning Dr. Pooley were false.

94.         An internal J&J memo dated May 16, 1973, establishes J&J's knowledge that Dr.

Pooley himself found asbestos "tremolite-type in Vermont." **Exhibit 21** (JNJAZ55_00001892,

5/16/1973 J&J Memo from Dr. F.R. Rolle to Dr. T.H. Shelley re Proposed Specs for Analyzing Talc

for Asbestos).

### 4.    *Lopez v. J&J (San Francisco Superior Ct. 2007)*

95.        In January 2007, Windsor's former President Roger N. Miller testified in

*Consuelo Lopez, et al. v. J&J, et al.,* No. 434580 (San Francisco Superior Ct. 2007), which

contended J&J's talc products caused plaintiff's asbestos disease. Miller was represented at the

deposition by J&J in house counsel John O'Shaughnessy.  At the deposition J&J allowed Miller to

testify that J&J's testing consultant, McCrone Associates, never found asbestos in the talc from any

of J&J's mines. **Exhibit 44** (1/16/2007 Deposition of Roger N. Miller, *Lopez v. J&J*, 84:12-15).

96.        During his deposition in *Lopez*, J&J further allowed Miller to testify that the

testing of the Argonaut Mine, which was the one of the Windsor mines used to produce Industrial

Talc, "never found" any asbestos in its talc. *Id*. at 103:10-104:13.

97.     J&J knew that Miller's testimony on both points was false according to numerous reports that were discovered during recent talc litigation, including a report issued by McCrone, before the Argonaut Mine was officially opened, finding chrysotile asbestos throughout the mine. **Exhibit 45** (4/24/1974 McCrone Examination of Talc Samples, Argonaut Ore Body).

### D.     The same J&J misrepresentations were made to every plaintiff.

98.     Upon information and belief, thousands of cases similar to those referenced above were filed by people with asbestos-related injuries, including asbestosis, lung cancer, and mesothelioma, which alleged that exposure to J&J/Windsor's talc caused the plaintiffs' injuries.

99.     No matter where and when those cases were filed, and despite all of the evidence to the contrary outlined above, J&J represented to every plaintiff and their counsel that there was no evidence of asbestos in J&J/Windsor's talc. **Exhibit 46** (3/8/2019 Deposition of Nancy Musco (Vol. 2), J&J Corporate Representative, *Foley v. Avon Products, Inc., et al.*, No. MID-L-3095-18 (N.J. Law Div.), 400:12–401:15).

100.     J&J understood there was a difference between representing that evidence existed that J&J disagrees with and the representation that no evidence of any asbestos in the talc exists at all. **Exhibit 6** (2/15/2019 Deposition of Nancy Musco (Vol. 1), J&J Corporate Representative, *Foley v. Avon Products, Inc., et al.*, 173:10-21), and, **Exhibit 35** (6/30/2021 Deposition of John O'Shaughnessy, Esq., (Vol. 2), *Vickie Forrest, et al., v. J&J, et al.*, No. 1522-CC0419-02, MDL No. 16-2738 (3d. Cir.), 466:12-20**).

101.     J&J's representations and its failure to disclose evidence it knew to exist, as exemplified in the cases set out in the above paragraphs, constitute a systematic pattern and practice of spoliation, fraudulent concealment, and fraud upon the courts in defending talc-injury litigation, the central element of which was J&J and its legal department members' concealment, suppression

and/or manipulation of all evidence of asbestos in its talc in order to represent that no such evidence existed. **Exhibit 46** (3/8/2019 Deposition of Nancy Musco (Vol. 2), *Foley, supra*, 400:12–401:15) (J&J Corporate Representative confirming consistent representation to plaintiff lawyers that that no evidence of asbestos in J&J's talc existed).

102.     J&J in-house counsel John O'Shaughnessy, Esq., recently admitted under oath that he supervised the J&J/Windsor's talc litigation nationally wherein J&J continually represented that J&J talc never contained asbestos in any form or tremolite. *See* **Exhibit 47** (6/23/2021 Deposition of John O'Shaughnessy, Esq., *Forrest, supra,* 289:4-290:5).

103.     In furtherance of this practice, J&J routinely provided sworn affidavits from company executives asserting that there was no evidence of asbestos in its talc. **Exhibit 46** (3/8/2019 Deposition of Nancy Musco (Vol. 2), J&J Corporate Representative, *Foley, supra*, 415:17–416:25).

104.     J&J repeatedly had its litigation corporate representatives certify answers to interrogatories in asbestos-injury cases that falsely stated that there was never any evidence of asbestos in its talc. **Exhibit 6** (2/15/2019 Deposition of Nancy Musco (Vol. 1), J&J Corporate Repr., *Foley, supra*, 139:8-22).

105.     Even in cases involving J&J/Windsor's talc where J&J or Windsor was not named as a defendant directly, J&J had its in-house and outside defense counsel take over, control, and orchestrate the defense regarding J&J/Windsor's talc, including providing false answers to discovery, false affidavits, and allowing in their presence, J&J witnesses to falsely testify under oath that there was no evidence of asbestos in J&J/Windsor's talc.

**E.      J&J's destruction and concealment of relevant evidence.**

106.      While some evidence of J&J/Windsor's talc-containing asbestos was recently discovered, despite J&J's past assertions that no such evidence existed, evidence has surfaced that other material evidence has been destroyed or secreted away and continues to remain missing to this day.

107.      Beginning in 1969, and certainly no later than 1971, J&J was on notice that the threat of asbestos talc litigation was looming over the horizon. From that point forward, J&J had a duty to preserve evidence and documents relevant to foreseeable litigation, including the responsibility to suspend any document destruction policies.

108.      Although J&J had an obligation to preserve evidence once litigation concerning the health effects of its talc products was foreseeable, at all times material hereto, it has failed to do so. *Id.* (2/15/2019 Deposition of Nancy Musco (Vol. 1), J&J Corporate Representative, *Foley, supra*, 278:24-280:23).

109.      Documents listed on J&J's privilege log recently produced in current talc litigation prove J&J's involvement in talc litigation dating back to 1971 and nearly every year thereafter. *Id.* at 93:3-16.

110.      While J&J internally recognized there could be consequences for failing to preserve evidence, there is no record of a litigation hold ever being imposed prior to 1997. Even then, J&J's General Counsel, John O'Shaughnessy, Esq., only preserved evidence when there was a specific case actually pending and not when anticipated. **Exhibit 35** (6/30/2021 Deposition of John O'Shaughnessy, Esq., *Forrest, supra,* 728:20-729:5).

### 5.   *J&J's failure to preserve talc samples and testing documentation and output.*

111.     At all times relevant to this current Action, J&J has been in complete control of all operational and safety aspects of the domestic and foreign subsidiaries implicated in its talc, including, but not limited to, the testing of talc source ore mines and testing of industrial talc.

112.     Despite its duty under court rules, and the obvious need to and importance of retaining specimens and samples of its talc, J&J did not retain any samples of J&J/Windsor talc, which it tested regularly (albeit insufficiently), for the presence of asbestos and asbestiform minerals at any time until 2017. *See* **Exhibit 49** (10/18/2018 Deposition of James Mittenthal (Vol. 2), *Leavitt and McElroy et al., v. J&J, et al.*, No. RG17882401 (Calif. Sup. Ct. Alameda Cnty.), 405:22-407:9; 424:2-425:7).

113.     The entries on J&J's privilege log produced in recent talc litigation indicate that samples of talc relevant to litigation existed at the time the litigation in the 1970s, 1980s, and 1990s was pending, but those samples were since destroyed. **Exhibit 6** (2/15/2019 Deposition of Nancy Musco (Vol. 1), J&J Corporate Representative, *Foley, supra*, at 93:17-94:16).

114.     Although litigation was pending and anticipated, the talc samples relied upon by J&J specifically to support the "no asbestos in talc" defense, were not retained under the company's evidence retention schedules and were not subject to any litigation hold. **Exhibit 49** (10/18/2018 Deposition of James Mittenthal (Vol. 2), *Leavitt*, *supra*, 371:14-374:9, 384:8-387:4, 405:22-407:9).

115.     J&J's failure to institute a litigation hold made certain that the talc testing samples and results were destroyed in accordance with its routine document retention policy. *Id.* at 405:22-407:1.

116.    J&J knew, or should have known, that this data and the tested talc samples would be material in pending and anticipated cases alleging injury resulting from exposure to its talc products, and, therefore, had a duty to preserve that testing evidence. Nevertheless, J&J destroyed those testing results and discarded its samples of talc. J&J, moreover, failed to preserve its talc samples maintained in its museum after 1982 when the museum was suspended, even though litigation was pending and anticipated at that time. **Exhibit 50** (7/12/2018 Deposition of Margaret Gurowitz, *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practicing, and Products Liability Litigation*, MDL No. 16-2738, (D. N.J.), 157:24–159:17).

117.    From the 1950s to the 2000s, J&J or outside laboratories, (including RJ Lee Group, Inc., and McCrone), tested samples of J&J's talc for asbestos.

118.    J&J did not instruct its consultants that tested its talc ore and products to retain the samples tested, even though litigation was pending and anticipated. *See, e.g.*, **Exhibit 50** (7/12/2018 Deposition of Margaret Gurowitz, MDL No. 16-2738, 158:12–159:16).

119.    Although J&J knew it was McCrone's policy to dispose of samples 30 days after testing results were generated, it never instructed McCrone to retain any samples, including the samples tested for purposes of litigation. *See, e.g.*, **Exhibit 51** (JNJTALC000387715, 1/28/1987 McCrone Letter to Windsor Roger N. Miller re McCrone Project No. ME-3241).

120.    Based on current knowledge and belief, J&J failed to ensure the preservation of these analysis materials: TEM grids, count sheets, photomicrographs, and other documents generated during the testing. A South Carolina Court, after considering all of the evidence regarding the fate of these materials, found that the testing data was wrongfully destroyed. **Exhibit 52**, (11/5/2021 Order of Jean Toal, *Angela Hood v. Acme Markets Inc., et al.*, State of South Carolina, Charleston County, C/A No. 2020-CP-10-03946 (Charleston Ct. of Common. Pl.).

38

121.     Any test results that J&J has not yet produced are presumed to be destroyed because of J&J's failure to issue a litigation hold and suspend the disposal of evidence pursuant to the document retention schedule. *Id.*

122.     This missing scientific data, as well as J&J's failure to preserve it, was of utmost importance to the fair and proper adjudication of Plaintiffs' and the Class Members' claims and J&J's defense. The limited underlying scientific data that still exists confirms that the reports of "no detectable" asbestos are (and can be) belied by the underlying scientific data, which shows evidence of asbestos.

123.     By withholding underlying or backup data/output/notes relating to the purported "none found" or "no quantifiable amount" reports to Plaintiffs' decedents and the members of the Class, J&J greatly impaired and prejudiced Plaintiffs' and the Class Members' Underlying Lawsuit cases by hampering (indeed eliminating) their ability to prove their case, as evidenced by the fact that underlying data that, by happenstance, avoided a shredder proves that the tests that J&J asserts were negative actually found the assayed J&J talc was contaminated with asbestos.

124.     J&J destroyed documents it acknowledged to be false. In this regard, J&J's internal documents produced in recent talc litigation matters indicate that numerous records related to "Products Safety" "Records Falsification", and "Record Retention Policy" were destroyed in 1998. *See* **Exhibit 48,** JNJTALC000837418 at JNJTALC00837248.

125.     The destruction of the underlying testing data was not limited to the testing conducted by McCrone, but extended and encompassed all the outside consultants hired by J&J. For example, while the University of Minnesota found asbestos in J&J's talc while litigation was pending against J&J, the photomicrographs underlying the reported findings of asbestos minerals are

missing. **Exhibit 54** (3/6/2019 Deposition of Dr. Susan Nicholson, M.D., (Vol. 2), *Foley v. Avon Products, Inc., et al.*, No. MID-L-3095-18 (N.J. Law Div.), 333:8-23).

126.     In 1989, after facing litigation related to its talc for nearly two decades, including the case involving Louis Edley, and anticipating further litigation, J&J intentionally destroyed records relating to its Hammondsville, Vermont mining operations. **Exhibit 55** (JNJ 000240739, 11/23/1993 J&J Talc Report, R. Denton to W. Ashton and D. Jones, re Talc Validation Team Meeting 11/16/1993, Windsor, Vermont, p. 3).

### 6.     *J&J's failure to preserve litigation case materials and records.*

127.     J&J preserved no records whatsoever from the majority of talc cases filed against it prior to 2010 including the cases involving Class Members.

128.     The cases described on the J&J privilege log indicate that the records from J&J's talc litigation dating back to 1971 are missing. **Exhibit 6** (2/15/2019 Deposition of Nancy Musco (Vol. 1), J&J Corporate Representative, *Foley, supra*, 93:17-94:16).

129.     J&J knew and understood that evidence gathered in or adduced during litigation concerning the health effects of its talc products would be material and relevant to other anticipated cases. *Id.* Yet J&J failed to preserve records from any of the lawsuits that alleged injuries as a result of all of its talc-based products, including J&J/Windsor Industrial Talc and Johnson's Baby Powder, even though J&J knew that relevant and material documents existed and were in its possession.

130.     For those cases where there is at least some documentation, J&J either lost or destroyed most of the material evidence related to historical litigation alleging asbestos-related disease from its talc-based products. *See e.g.,* **Exhibit 46** (3/8/2019 Deposition of Nancy Musco (Vol. 2), J&J Corporate Representative, *Foley, supra*, 361:24-362:17); **Exhibit 6** (2/15/2019

40

Deposition of Nancy Musco (Vol. 1), J&J Corporate Repr., *Foley, supra*, 232:9-17) (re missing *Edley* interrogatories); (*id*. at 111:23–112:3) (no records from the *Cunningham* case); (*id*. at 112:10-25) (no records from the *Kreppel* case); (*id*. at 113:12–114:3) (no records from the *Lopez* case); *id*. at 114:19-22) (no records from the *Sheldon* case).

131.     Despite being involved in countless talc/asbestos cases dating back to 1971, J&J maintains that it is only able to locate two sets of discovery responses out of the thousands of cases filed against it before 2010. *See id*. at 202:2-13.

### 7.     *J&J's failure to preserve its toxicology files on talc.*

132.     J&J maintained toxicology information related to talc in boxes and binders.

133.     This toxicology information contained in those files was never disclosed in the Underlying Lawsuits and to date also remains missing.

### 8.     *J&J's failure to preserve William Ashton materials and records.*

134.     William Ashton, a J&J corporate scientist known within J&J as "Mr. Talc," was intimately involved in issues involving and affecting the safety of talc for the entire length of his career at J&J which spanned many decades.

135.     As part of his responsibilities at J&J, William Ashton maintained his own set of files concerning J&J's talc.

136.     The files concerning talc and asbestos maintained by William Ashton, which existed while the Underlying Lawsuit litigation was pending, are presently unaccounted for in contemporary talc litigation despite their relevance. *See* **Exhibit 56** (J&J Handwritten Note from Rebecca Farlow to William Ashton) ("Here is a list of TALC files from the last case.").

41

### 9. *J&J's failure to preserve McCrone Associates' materials and records.*

137.     According to J&J's records, McCrone was J&J and Windsor's primary outside consultant tasked with testing J&J talc for asbestos.

138.     McCrone's original testing files on J&J's talc were sent to J&J's in-house counsel while litigation was pending.

139.      Instead of producing those files to litigants alleging talc related injuries in the Underlying Lawsuits, the files were secreted away by J&J in the offices of its outside defense counsel. *See* **Exhibit 57** (1/3/1995 McCrone Letter from L. Brain to J. O'Shaughnessy, Esq., re Windsor - McCrone File No. ME-4055), and **Exhibit 35** (6/30/2021 Deposition of John O'Shaughnessy, Esq., *Forrest, supra,* 442:10-443:1; 573:12-574:3; 669:14-670:13).

140.     While some McCrone testing results were finally produced in contemporary talc litigation matters sometime after 2016, which documents show the relevance of the information, the complete McCrone files, which would have included all of the original testing data secreted away in the offices of outside counsel, were neither produced to Class Members in their Underlying Lawsuits nor been produced today to plaintiffs prosecuting contemporary talc claims against J&J. The location or fate of the complete arsenal of McCrone files is unknown. Based upon this, Plaintiffs believe, and, therefore, allege that all of this critical underlying scientific data has accordingly been either lost or destroyed.

**F.     Recent discovery in contemporary talc litigation has uncovered thousands of documents which reveal that the exculpatory statements that there was no evidence of asbestos in J&J/Windsor's Industrial Talc Products J&J routinely made to courts and asbestos claimants were materially false and misleading.**

141.     Sometime after 2016, J&J in contemporary talc litigation was forced to acknowledge the existence of and eventually produce evidence of asbestos testing it withheld for nearly 50 years.

142.     That evidence established that contrary to the sworn statements of J&J's representatives and the representations of its counsel as officers of the Court, there was, in fact, evidence of asbestos in J&J's talc and its source, the Vermont mines.

143.     Not only did the routine testing of J&J's talc demonstrate the presence of asbestos as set forth above, the consulting scientists and experts used by J&J to help defend litigation secretly told J&J's in-house counsel that there was, in fact, evidence of asbestos in J&J's talc.

144.     In this regard, a recently discovered memo from 1995, that J&J's lawyers fought to keep under seal, documents a meeting between University of Vermont Geology Professor Barry Doolan and J&J's in-house counsel, John O'Shaughnessy, Esq. According to the memo, Professor Doolan reviewed the original McCrone asbestos testing file and advised O'Shaughnessy that there were, in fact, testing results in the file reporting that J&J's talc contained chrysotile asbestos.

**Exhibit 36** (4/4/1995 J&J Memo re: Site Visit to Vermont Mines and Interview with Barry Doolan – 3/23/1995).

145.     In 1998, J&J's litigation consultant, Dr. Alice Blount, Ph.D., a Rutgers University Mineralogist, advised the J&J's counsel that she ran her own tests on J&J's talc and found asbestos.

**Exhibit 13** (JNJ 000064241, 4/23/1998 Letter from Dr. A. Blount, Ph.D., to M. Raymond Hatcher,

Esq.). In the letter, Dr. Blount informed J&J "[a]s I told you, I believe that Johnson & Johnson's

Vermont talc contains trace amounts of asbestos…." *Id.*

146.     When confronted with the evidence unearthed through recent discovery, J&J

Corporate Representative, Dr. John Hopkins, Ph.D., admitted during cross examination at a recent

trial that the affidavit of Roger N. Miller drafted and submitted by J&J in Louis Edley's case, was

false. According to Dr. Hopkins's testimony:

> Q.     This is the President of Windsor Mineral [Roger N. Miller] in a lawsuit
> saying, no evidence of the presence of asbestos in Windsor Minerals'
> product. And he included – I asked you, he included everything they'd ever
> sold, cosmetic and industrial, has ever revealed or been revealed by this
> testing. Here's the question. Was that true or was that false?
>
> A.     On the face of it, it does not appear to be true.
>
> ****
>
> Q.     And he was under oath, wasn't he?
>
> A.     I believe so, yes.
>
> Q.     And that is – you understand that is perjury, do you not?
>
> A.     I do.

**Exhibit 2** (Testimony of Dr. John Hopkins, Ph.D., (Vol. 1 of 2), J&J Corporate Representative,

7/23/19 *Barden v. Brenntag North America, et al.*, MID-1809-17 (N.J. Law Div.), Trial

Transcript, 192:24-193:7; 194:24-195:3).

147.     Dr. Hopkins's admission proves that every statement made by J&J that there was

**no evidence** of asbestos in J&J/Windsor's talc in the context of prior litigation, including his own,

was false.

G.   **J&J's fraudulent concealment and spoliation prevented Plaintiffs, Plaintiffs' decedent, and Class Members from discovering J&J's fraudulent activity despite the exercise of diligence, thereby warranting the tolling of any applicable statute of limitations.**

148.   For nearly 50 years, J&J was able to successfully keep its ongoing fraudulent coverup of the fact that its talc contained asbestos secret and unknown by Plaintiffs, their counsel, and others similarly situated.

149.   The successful operation of the fraudulent defense, as well as the Defendants' own financial, corporate and/or professional well-being once the scheme got underway, depended upon: (a) the false denial of the existence of evidence of asbestos in J&J's talc; (b) the destruction, secreting and/or concealment of J&J's documents and evidence relating to Class Members' underlying asbestos injury claims beginning in 1971, and (c) the concealment and cover-up of the spoliation of documents and evidence.

150.   The successful operation of Defendants' fraudulent scheme, as well as its own financial, corporate, and/or professional well-being, once execution of the scheme got underway, depended upon maintaining continuity, consistency, and secrecy in making the false exculpatory misrepresentations and misleading omissions involved in the scheme.

151.    When executing the fraudulent defense and collateral activities described above, Defendants, therefore, carefully, consistently and, as it turned out, successfully, concealed the existence of its fraudulent litigation strategy, as well as the scheme, of its participants' involvement and activities in its commission.

152.   In view of the foregoing, Plaintiffs and the Members of the Class (as well as their decedents and lawyers) could not have discovered the fraudulent litigation actions and omissions being directed and perpetrated against them despite the exercise of reasonable diligence.

153.     In view of the foregoing, any applicable statutes of limitations should be held inapplicable or tolled due to and on account of Defendants' knowing and active concealment, suppression, and denial of the facts and evidence, as alleged herein.

154.     Further, Plaintiffs, Plaintiffs' decedent while alive, and Members of the Class (and their respective decedents where applicable) have, as a direct result of Defendants' conduct, been kept in ignorance of vital information essential to the pursuit of their claims, without any fault or lack of reasonable diligence on their part.

155.     Plaintiffs and Members of the Class could not reasonably have discovered the spoliation and the fraudulent nature of Defendants' conduct. Accordingly, Defendants should be estopped and/or enjoined from asserting or relying upon any statute of limitations, statutes of repose, laches, or defense to any substantive cause of action based upon time limitations to defeat or hinder any of Plaintiffs' claims asserted herein.

## V. CLASS ACTION ALLEGATIONS

156.     Plaintiffs bring this action in their own right, as personal representatives of their late father's Estate, and as class representatives pursuant to *R.* 4:32-1 (b)(1)(A), (b)(2), and (b)(3) on behalf of a class (**"Class"**) defined as follows:

> All Persons within the United States and its territories (or where a person is or was deceased, the estate of such person), who prior to the commencement date of this litigation: (a) filed a lawsuit (or was the subject of a survival or wrongful death action) against J&J, Windsor and/or a Third Party (**"Underlying Lawsuit"**) to obtain asbestos-related bodily injury, survival action, and/or wrongful death action compensation arising from or involving claimed exposure to J&J/Windsor Industrial Talc; and (b) who either, (i) after the suit was filed, voluntarily dismissed or terminated the Underlying Lawsuit or any claim in the Underlying Lawsuit that was based on claimed asbestos exposure to Industrial Talc products mined, milled, sold, and distributed prior to January 6, 1989, by J&J, Windsor or Windsor's corporate predecessor. (Such talc ore and resulting talc products involved in this matter and the class claims being made herein as "J&J/Windsor Industrial Talc")

including any voluntary dismissal or release of claims due to settlement; or, (ii) after the suit was filed, had their Underlying Lawsuit or any claim in the Underlying Lawsuit that was based on claimed asbestos exposure from J&J/Windsor Industrial Talc, involuntarily dismissed as to J&J, Windsor and/or a Responsible Third Party.

157.    For purposes of this class definition:

(a) **"Industrial Talc"** means talc that has not been added into or packaged into a consumer product distributed or sold for personal body application or personal use, such as body powder, cosmetics, or as a pharmaceutical ingredient.

(b) **"Third Party"** means any entity that was charged in an Underlying Lawsuit with being legally responsible in whole or in part for J&J/Windsor Industrial Talc distributed or sold prior to January 6, 1989, as to all Windsor mines, excluding any talc originating from the Johnson Mine distributed or sold after October 1, 1967.

(c) The Class includes those persons who have or had the right to claim damages derivatively based upon the Underlying Lawsuit's asbestos exposed person's asbestos-related injury, such as, by way of illustration, a spouse with consortium claims, an appointed personal representative of decedent, or the exposed person's wrongful death statute heirs or beneficiaries.

(d) The terms **"J&J"** or **"Third Party"** specifically do _not_ include:

(i)    LTL Management, LLC, or, Johnson & Johnson Consumer, Inc. (formerly known as Johnson & Johnson Baby Products Company, a New Jersey company incorporated in 1979 and wholly owned by J&J); and

(ii)    BASF Catalysts, LLC, (formerly known as Engelhard Corporation), including its following subsidiaries and affiliates: Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals

Phillipp Corporation, Eastern Magnesia Talc Company, Porocel Corporation, and Pita Realty Limited, along with each of these BASF company successors, affiliates, direct and indirect parent(s) (including BASF Corporation and BASF SE), and, any predecessor(s) who owned and/or operated the Emtal Talc mine in Johnson, Vermont, at any point on or after October 1, 1967.

(e) For avoidance of doubt, notwithstanding anything in the definition to the contrary or alleged herein, specifically *excluded* from the Class are:

(i) those persons who were harmed exclusively by talc that has been added into or packaged into a consumer product distributed or sold for personal body application or personal use such as body powder, cosmetics, or as a pharmaceutical ingredient (**"Cosmetic/Personal Use Talc Exclusion"**);

(ii) any governmental entities;

(iii) all judges assigned to hear any aspect of this litigation, as well as their immediate family members, and

(iv) the directors and officers of Defendant and its affiliated companies along with their immediate families.

158. Plaintiffs are a Member of the Class that they seek to represent.

159. Members of the Class can be identified from: J&J's records, third party co-defendants' records, insurance company records, court records, records of J&J's counsel, records of asbestos claimants' counsel, records of unions in which Class Members belonged, and asbestos claims representatives and claimants' records. Notice can be given to the Class through direct notice and general print and electronic publication means.

48

160.     Plaintiffs' claims are typical of the claims of the other Class Members' because Plaintiffs and all putative Class Members were and are similarly affected by Defendants' spoliation of asbestos evidence, fraud, and fraudulent concealment, including the fraudulent litigation scheme, which involved a systematic pattern and practice of uniform misrepresentations, concealments, alterations, and suppression of material facts, and the declaratory and equitable relief sought and compensatory and punitive damages related to Defendants' fraud and fraudulent concealment under New Jersey law herein is for the benefit of Plaintiffs and Members of the Class.

161.     Class Members are so numerous that their individual joinder is impracticable. On information and belief, the class numbers in many thousands.

162.     Common questions of law and fact predominate over the questions affecting only individual Class Members. Some of the common legal and factual questions include:

(a)  Whether Defendants fraudulently concealed and spoliated material evidence relating to Class Members' underlying asbestos claims?

(b)  Whether Defendants concealed and covered up the spoliation of material evidence relating to Class Members' Underlying Lawsuits?

(c)  Whether Defendants wrongfully, tortiously, and unjustly utilized and exploited the spoliation of evidence relating to Class Members' underlying asbestos claims to J&J's benefit and the Class Members' detriment and harm?

(d)  Whether Defendants systematically and uniformly misrepresented to Class Members that J&J/Windsor's Industrial Talc did not contain asbestos?

(e)  Whether Defendants uniformly misrepresented to Class Members that there was no evidence that J&J/Windsor's Industrial Talc Products contained asbestos?

49

(f) Whether Defendants knowingly and purposely withheld material information and facts to Class Members concerning the existence, whereabouts or fate of documents, and other evidence regarding the presence of asbestos in J&J/Windsor's Industrial Talc Products?

(g) Whether Defendants systematically and uniformly withheld material information and facts to Class Members concerning the presence of asbestos in J&J/Windsor's Industrial Talc?

(h) Whether Defendants directed, aided and abetted others to commit acts in furtherance of the fraudulent litigation strategy or any of its elements, and if so, who and when?

(i) Whether Defendants are liable to the Class for compensatory and punitive damages and other available relief under New Jersey law for committing spoliation, fraud, and fraudulent concealment of evidence, or materially assisting those who have done so?

(j) Whether Plaintiffs and the Class are entitled to declaratory or equitable relief based upon Defendants committing spoliation, fraudulent concealment, or aiding and abetting other defendants in the commission of these tortious acts?

(k) Whether Defendants committed obstruction of justice or a fraud upon the court by their commission of the fraudulent litigation strategy?

(l) Whether Plaintiffs and the Class are entitled to declaratory or equitable relief that alleviates and cures any impairment, detriment, or harm inflicted upon them by the spoliation of the evidence relating to Class Members' Underlying Lawsuits, including any detriment or harm attributable to the passage of time such as loss of witnesses and documentation needed to establish a Class Member's Underlying Lawsuit's asbestos injury claim?

(m) Whether Plaintiffs and the Class are entitled to equitable relief that alleviates and cures any impairment, detriment, or harm inflicted upon them by the Defendants' fraudulent and

deceitful misrepresentations, acts, and omissions in furtherance of the fraudulent litigation

strategy, including any harm attributable to the passage of time, such as loss of witnesses and

other documentation needed to establish Class Members' claims herein?

(n) Whether Defendants should, on equitable principles, be required to disgorge any money that

are found to unjustly enrich them or were illegally earned, saved, or retained?

(o)  Whether assessment of compensatory and punitive damages against the Defendants are

warranted and just under the circumstances?

(p) Whether the spoliation of evidence relating to Class Members' Underlying Lawsuits'

asbestos injury claims was unknown and unknowable to Plaintiffs and Members of the Class

due to Defendants' concealment of the spoliation and its fraudulent litigation strategy?

(q) Whether in light of the extraordinary misconduct giving rise to this case, an immediate

publication notice to the Class apprising them of the alleged circumstances and their legal

rights at Defendants' expense is warranted and should be ordered as preliminary injunctive

relief? and

(r) Whether Class Members are entitled to a declaration that J&J's communications and/or

attorney work product relating to the fraudulent conduct and/or the spoliation of evidence are

not privileged attorney-client communication or work product under the crime-fraud

exception?

163.     The Defendants engaged in a course of conduct to perpetuate a common,

coordinated fraudulent scheme giving rise to the legal rights sought to be enforced by Plaintiffs and

the Class Members. Similar or identical common law violations are involved, and New Jersey's law

may be constitutionally, properly, and prudentially applied in this matter. Individual questions, if

any, pale in comparison and are indeed subordinate to the numerous common questions that predominate.

164.    The injuries sustained by Plaintiffs and Class Members flow, in each instance, from a common nucleus of operative facts—the spoliation of evidence and/or fraudulent or misleading denial of the existence of and/or withholding of evidence material to Class Members' underlying asbestos injury claims; the Defendants' uniform pattern practice of misrepresentations and deceitful misconduct and non-disclosures regarding the nature of J&J/Windsor's talc products; and the Defendants' false claim of nonexistence of any evidence that these products contained asbestos.

165.    Plaintiffs and the Class Members have been damaged by the Defendants' misconduct by being hampered or unable to prove claims based on the existence of asbestos in J&J/ Windsor Industrial Talc Products. In the absence of the fraudulent scheme, Plaintiffs and the Class Members would have had the unfettered right to pursue litigation against J&J and any Responsible Third Party on an even playing field in a fair and honest judicial proceeding, including the opportunity to recover compensation for their respective economic damages and losses.

166.    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are familiar with the basic facts that form the bases of their and the Class Members' claims. Plaintiffs' interests do not conflict with the interests of the other Class Members that Plaintiffs seek to represent. Plaintiffs have retained counsel competent and experienced in class action litigation and intend to prosecute this Action vigorously.

167.    The Class is certifiable under *R.* 4:32-1(b)(1)(A) in that prosecuting separate actions by individual class members against the Defendants could create a risk of inconsistent or

varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class, the Defendants herein.

168.     The Class is certifiable under *R.* 4:32-1(b)(2) in that Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

169.     The Class is certifiable under *R.* 4:32-1(b)(3), because:

(a)  Individual litigation of the legal and factual issues raised by Defendants' wrongful conduct would increase delay and expense to all parties and to the court system, causing a denial of justice to many Class Members.

(b)  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision and management of a complex situation created by Defendants' egregious alleged misconduct by a single court.

(c)  Given the similar nature of the Class Members' claims, the uniform applicability of New Jersey common law and applicable rules of evidence in this case is warranted and proper due to, *inter alia*, the following factors: New Jersey's overwhelming significant contacts and government interests to the matter; the location of J&J's headquarters in New Jersey, where the fraudulent litigation strategy was created, directed and controlled; the location of the J&J legal department charged with implementing the strategy, the spoliation of evidence occurring in New Jersey or being directed therefrom; the commission of numerous deceitful acts and omissions taking place in New Jersey, where some of J&J's alleged fraudulent affirmations under oath were signed and notarized; and the relative

absence of material differences in the laws upon which the Class Members' claims are based; and,

(d)  The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Class Members. The burden and expense entailed in the individual prosecution of individual cases against the Defendants on the claims at issue greatly overshadow the values of most if not all individual cases, and the number of Underlying Lawsuits effected would make trying individual suits a burden up the courts.

## VI. CAUSES OF ACTION

## COUNT I: FRAUDULENT CONCEALMENT AND SPOLIATION

170.      Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

171.      Beginning in 1969, and continuing thereafter as well, J&J was cognizant and aware that J&J had been sued by asbestos injury claimants contending that J&J/Windsor Industrial Talc contained asbestos, which caused asbestos personal injuries.

172.      In 1969, and continuing thereafter as well, J&J was cognizant and aware that it was foreseeable and likely that J&J and/or Windsor in the future would be sued by other asbestos injury claimants, including claimants who were injured or residing in New Jersey, and who would claim and contend that J&J/Windsor talc products comprised of or made therewith contained asbestos which injured them.

173.      In 1969, and continuing thereafter as well, given their knowledge about the volume and the wide use of J&J/Windsor Industrial Talc in the United States in many industries, the

54

latent and progressive nature of asbestos disease, and the direction of asbestos litigation at that time, J&J was aware and understood that it was foreseeable and likely that J&J and/or Windsor in the future, would be directly sued by asbestos injury claimants (including claimants who were injured or residing in New Jersey), who would claim and contend that J&J/Windsor Talc and/or products made with same contained asbestos which injured them. J&J also became similarly aware that it might be called upon to defend asbestos injury claims brought against Responsible Third Parties with respect to J&J/Windsor Industrial Talc sold during the time Windsor had operated the Vermont mines.

174.     In view of their knowledge that talc asbestos litigation against J&J, and Responsible Third Parties was foreseeable and likely, at all times material herein, including after 1969, J&J was under a duty to preserve evidence and documents in its possession, custody, or control that were relevant to such claims and litigation, including a duty to suspend or modify any document retention policies that were in effect or were being put into operation as such related to the destruction and retention of documents and evidence relevant to asbestos injury claims involving talc.

175.     At all times material herein, Defendants were under a legal duty of candor and truthfulness towards asbestos litigants suing it or them, as well as to courts presiding over the lawsuits concerning these claims. This duty of candor or truthfulness precluded the filing or submission of affidavits and verifications in support of facts, requests, or motions where J&J, acting as aforesaid, knew the facts to be false or where it had no reasonable and good faith basis to believe and assert the facts as being true.

176.     As set forth above, and in violation of their duties regarding the preservation of evidence, beginning in or about the early 1970s, J&J, acting as aforesaid, began and continued to engage in, and directed and orchestrated others to engage in, a uniform and persistent pattern and

practice of evidence spoliation by altering test reports, withholding test reports, hiding test reports and backup data/materials, devising and then employing test methods designed to avoid or conceal detection of asbestos in talc ore or talc products, failing to preserve evidence, and otherwise withholding, concealing and/or destroying material evidence relating to the Plaintiffs' decedent's and the Class Members' underlying asbestos injury claims—all with the purpose, intent, and design of obstructing, impeding, impairing, disrupting, and/or otherwise defeating the rights of asbestos injury litigation claimants in suits in which J&J or Windsor was or were a party or its talc products were in issue.

177.    At all times materials herein, J&J knew that there was inculpating material evidence relating to Plaintiffs' decedent's and Class Members' underlying asbestos injury claims in its or their possession, custody, or control, including evidence and corporate knowledge that J&J/ Windsor Industrial Talc contained asbestos.

178.    At all times material herein, J&J knew that it and its' subsidiaries' records and corporate knowledge, along with discovery and other litigation materials, including deposition transcripts and related documents, in prior asbestos injury suits or claims, were a material and important source of information and evidence regarding J&J/Windsor's Industrial Talc. J&J also knew that said information and evidence as time progressed could not be obtained by Plaintiffs' decedent and Class Members from any other source.

179.    As the direct, proximate, and naturally occurring result of the above described deliberate withholding, destruction, and/or concealment of documents and evidence relating to Class Members' Underlying Lawsuits' asbestos claims, and/or the false and misleading statements thereafter that no such documents or evidence existed, Plaintiffs and Members of the Class were hampered and impaired in the prosecution of their cases, and, therefore, either: (a) suffered an

involuntary dismissal of their lawsuit or a claim therein, because they could not produce evidence contradicting the false and misleading assertions and averments that J&J/Windsor Industrial Talc did not contain any asbestos and there was no evidence that it did; (b) voluntarily dismissed or discontinued their cases or claims based upon asbestos being present in J&J/Windsor Industrial Talc without consideration; or (c) voluntarily dismissed or discontinued their cases in whole or part as to J&J, Windsor, or Responsible Third Parties as parties in the Underlying Lawsuit—or as to claims in the Underlying Lawsuits that were based upon asbestos being present in J&J/Windsor Industrial Talc for a nominal or token consideration instead of full, fair, and complete compensation they were entitled to under law.

180.     As the result of the voluntary or involuntary dismissal or discontinuance of asbestos claims against J&J, Windsor, or Third Parties, Plaintiffs and Members of the Class suffered the loss of their asbestos injury claims, their right under law to pursue and receive full, fair, and just compensation for their asbestos injury claims and their right to fair, honest, and just judicial proceedings.

181.     As a further proximate result of the above tortious acts, activities, and omissions, Plaintiffs and other Class Members were hindered and impaired in the prosecution of their cases and consequently may or will incur, or have already incurred, pecuniary losses and damages, including, but not limited to: the loss of their underlying asbestos injury claims, the expenses and costs of proceeding without this evidence, the expenses and costs incurred in the effort to replace, locate, or identify evidence, and/or the cost of prosecuting this case to prove fraud, fraudulent concealment, and spoliation of evidence; any and all of which Plaintiffs and the Members of the Class would not otherwise have suffered or incurred.

182.     Plaintiffs and the Class have been irreparably harmed by Defendants' spoliation, fraud, and fraudulent concealment. Given the extraordinary circumstances here, together with the matter's overwhelming contacts and connection to New Jersey, declaratory and equitable relief from this Court is needed and warranted to help remedy the widespread injuries, harm, and deprivations suffered by Plaintiffs and the Class Members victimized by Defendants' wrongdoing in the form of, *inter alia*: (a) a declaratory judgment determination and finding that Defendants committed fraud, fraudulent concealment, and spoliation that targeted persons making asbestos claims against J&J, Windsor, or Responsible Third Parties, or, persons establishing claims based upon J&J/Windsor Industrial Talc; (b) a robust notification program providing information about Defendants' fraud, fraudulent concealment, and spoliation, as well as other information designed to enable those victimized and injured by the fraud (or where deceased or incompetent their personal representatives or next of kin) to make an informed decision regarding their rights; (c) adjunct declaratory and injunctive relief curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious misconduct is responsible for creating; and (d) a decree ordering Defendants to render an accounting and thereafter disgorgement of any monetary benefits and funds revealed in the accounting which, in all equity and conscious of the Court, Defendants should not retain under the circumstances, together with an equitable distribution of such disgorgement.

183.     In addition to the forgoing equitable relief, Plaintiffs and Members of the Class are entitled to compensatory and punitive damages against J&J for loss of their right and ability to fully and fairly prosecute their Underlying Lawsuits, under the law of New Jersey-wherein the fraudulent concealment of evidence, including the spoliation of the documents and materials, was committed, or such other law the Court finds applicable for spoliating and fraudulently concealing evidence, based upon J&J's role or roles in committing and or in directing, orchestrating, and /or

aiding and abetting others in the spoliation of evidence material to Plaintiffs' and Class Members'

Underlying Lawsuits.

## COUNT II: FRAUD AND DECEIT

184.     Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated

herein.

185.     As set forth above, beginning on or about 1971, J&J, acting as aforesaid, engaged

in a continuous, uniform, and persistent pattern and practice of falsely misrepresenting, or directing

or orchestrating others to falsely misrepresent, to Plaintiffs, Members of the Class, their counsel, and

presiding courts, that:

(a)     J&J/Windsor Industrial Talc Products did not contain asbestos fibers; and/or

(b)     That there was not any evidence that J&J/Windsor Industrial Talc Products

contained asbestos.

186.     Each such representation was false and misleading at the time it was made.

187.     Defendants, acting as aforesaid, knew each representation was false and

misleading or made the representation in reckless disregard as to its truth or falsity.

188.     Each representation was deliberately made or directed to be made by J&J, acting

as aforesaid, with the purpose and design of obstructing, impeding, impairing, terminating, and/or

otherwise disrupting asbestos injury litigation in which J&J, Windsor, and/or a Responsible Third

Party was or were a party.

189.     In addition to the above misrepresentations, J&J, acting as aforesaid, engaged in a

continuous, uniform, and persistent pattern and practice of, directly or indirectly, making or directing

and orchestrating others to make, material omissions of fact, or, alternatively, omitting and

withholding facts that J&J and Responsible Third Parties were under a duty to divulge in order make

any statements made, in the light of the circumstances under which they were made, not misleading,

regarding: (a) the absence of asbestos in J&J/Windsor Industrial Talc Products; and/or, (b) the non-

existence of evidence that J&J/Windsor Industrial Talc Products contained asbestos.

190.    Defendants, acting as aforesaid, knew the misrepresented, omitted, or withheld

facts and/or its non-disclosures were false and misleading to those they were made or directed to,

including Plaintiffs' decedent and Members of the Class, their respective counsel, and where and

when applicable, presiding courts. Defendants knew and intended that its misrepresentations and

non-disclosures would be repeated or republished amongst the asbestos plaintiffs' bar, be accepted

as true, and affect the advice given to and decisions made by asbestos claimants regarding asbestos

claims against J&J.

191.    Each misrepresentation and omission of material fact was deliberate and

committed with the intent, purpose, and design of obstructing, hampering, impeding, impairing,

terminating, and/or otherwise disrupting asbestos injury litigation in which J&J, Windsor, or a

Responsible Third Party was a party, or asbestos litigation in which J&J/Windsor Industrial Talc was

in issue in the matter, as well as to cover up Defendants' wrongdoing.

192.    Plaintiffs and Members of the Class, as did their respective counsel, naturally,

reasonably and detrimentally relied upon J&J to tell the truth and produce evidence required by the

rule of law, which J&J failed to do (or directed or permitted others it controlled or confederated with

to fail to do), thereby causing Plaintiffs' decedent and Class Members to either: (a) suffer an

involuntary dismissal of their lawsuit or a claim therein, because they could not produce evidence

contradicting the false and misleading assertions and averments that J&J/Windsor Industrial Talc did

not contain any asbestos and there was no evidence that it did; (b) voluntarily dismiss or discontinue

their cases or claims based upon asbestos being present in J&J/Windsor's Industrial Talc without consideration; (c) voluntarily dismiss or discontinue their cases in whole or part as to J&J, Windsor, or Responsible Third Parties as parties in the Underlying Lawsuit—or as to claims in the Underlying Lawsuits that were based upon asbestos being present in J&J's/Windsor Industrial Talc — for a nominal or token consideration instead of full, fair, and complete compensation they were entitled to under law.

193.    Given the extraordinary circumstances here, together with the matter's overwhelming contacts and connection to New Jersey, declaratory, and equitable relief from this Court is needed and warranted to help remedy the widespread injuries, harm, and deprivations suffered by Plaintiffs and the Class Members victimized by Defendants' wrongdoing in the form of, *inter alia*: (a) a declaratory judgment determination and finding that Defendant committed fraud, suppression of facts, and spoliation that targeted persons making asbestos claims against J&J, Windsor, or Responsible Third Parties—or claims based upon J&J/Windsor's Industrial Talc; (b) a robust notification program providing information about Defendants' fraud, spoliation, and suppression of facts, as well as other information designed to enable those victimized and injured by the fraud (or where deceased or incompetent their personal representatives or next of kin) to make an informed decision regarding their rights against J&J; (c) adjunct declaratory and injunctive relief curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious misconduct is responsible for creating; and (d) a decree ordering Defendants to render an accounting and thereafter disgorgement of any monetary benefits and funds revealed in the accounting which, in all equity and conscious of the Court, Defendants should not retain under the circumstances, together with an equitable distribution of such disgorgement.

## COUNT III: FRAUD UPON COURTS

194.     Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

195.     The fraudulent and deceitful acts and flagrant violations of the rules of court by Defendants alleged above committed in each instance a fraud upon the courts that tainted and affected the presiding court's ability to fairly adjudicate the Class Members' respective Underlying Lawsuits as well as protect and maintain the integrity of the presiding court and its judicial processes.

196.     Courts have an inherent right, power, and duty to deter such assaults upon their core function and integrity such as Defendants perpetrated, and, provide full and complete equitable relief necessary to right and correct the wrongs Defendants inflicted, including the harm to the rights and claims of parties targeted by the misconduct.

197.     Plaintiffs' decedent and Members of the Class were targeted and subjected to Defendants' acts, activities, and omissions constituting a fraud upon the courts, including the courts of New Jersey, and were proximately caused to be harmed thereby as described above.

198.     Plaintiffs and the Class have been irreparably harmed by the Defendants' fraud upon the courts for which there is no adequate remedy at law given Defendants' extraordinary misconduct and the circumstances it created thereby. Given the extraordinary circumstances here, together with the matter's overwhelming contacts and connection to New Jersey, declaratory and equitable relief from this Court is needed and warranted to help remedy the widespread injuries, harm, and deprivations suffered by Plaintiffs and the Class Members victimized by Defendants' wrongdoing in the form of, *inter alia*: (a) a declaratory judgment determination and finding that the Defendants committed fraud, fraudulent concealment, and spoliation that targeted persons making

asbestos claims against J&J, Windsor, or Responsible Third Parties or claims based upon J&J/Windsor's Industrial Talc; (b) a robust notification program providing information about Defendants' fraud, fraudulent concealment, and spoliation, as well as other information designed to enable those victimized and injured by the fraud (or where deceased or incompetent their personal representatives or next of kin) to make an informed decision regarding their rights against J&J; (c) adjunct declaratory and injunctive relief curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious misconduct is responsible for creating; and (d) a decree ordering Defendants to render an accounting and thereafter disgorgement of any monetary benefits and funds revealed in the accounting which, in all equity and conscious of the Court, Defendants should not retain under the circumstances, together with an equitable distribution of such disgorgement.

## ¶VIII. DEMANDS FOR RELIEF

**WHEREFORE**, Plaintiffs in their own right, and on behalf of others similarly situated, demand judgment against Defendants in the alternative for the following relief:

a.   Certification of the matter as a class action as requested;

b.   A declaratory determination and judgment that fraudulent concealment and spoliation of material evidence relating to the existence of asbestos in J&J/Windsor's Industrial Talc Products has occurred to the detriment of the Class Members with corresponding mandatory injunctive relief requiring Defendants to locate and notify Class Members or, if applicable, their personal representatives or their next of kin, as of this finding and their corresponding need to promptly consult with counsel regarding their legal rights as a result;

c.   A declaratory determination and judgment that J&J committed fraud and deceit, and, a fraud upon courts, relating to the existence of asbestos in J&J/Windsor's Industrial Talc to the detriment and harm of the Class Members with corresponding mandatory injunctive relief requiring Defendants to locate and notify Class Members or, if applicable, their personal representatives or their next of kin, as of this finding and their corresponding need to promptly consult with counsel regarding their legal rights as a result;

d.   A determination and declaration of the need for and ordering execution of a notice program paid for by Defendants informing Class Members or their representatives of the pendency of this Action, J&J's alleged misconduct, and their rights to proceed against Defendants to pursue the causes of action set forth herein;

e.   A declaration, injunction, or decree imposing a constructive trust upon Defendants' property, and, requiring Defendants render an accounting to the Court of all fees, revenues, costs, insurance proceeds, and expense savings relating to Plaintiffs' and absent Class Members' asbestos injury claims;

f.   A determination and declaration of Defendants' liability for disgorgement or restitution of revenues, profits, and money unjustly earned from the commission of the frauds upon the courts, upon Plaintiffs' and Members of the Class and/or by the commission of proscribed activities described above;

g.   A determination of Defendants' liability for compensatory and punitive damages to Plaintiffs and the Class relating to the fraud, fraudulent concealment, and spoliation of evidence relevant and material to establishing asbestos injury claims against J&J; and

h.   Such other relief as may be available and just.

### VIII. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 9, 2022                    **COHEN, PLACITELLA & ROTH, P.C.**


_____/S/ Christopher M. Placitella_____
Christopher M. Placitella, Esq. (ID 27781981)
Michael Coren, Esq. (ID 24871979)
Dennis M. Geier, Esq. (ID 035272006)
Eric S. Pasternack, Esq. (ID 015132011)
Jared M. Placitella, Esq. (ID 068272013)
Justin I. Placitella, Esq. (ID 105812014)
(732) 747-9003
cplacitella@cprlaw.com
mcoren@cprlaw.com
dgeier@cprlaw.com
epasternack@cprlaw.com
jmplacitella@cprlaw.com
justinplacitella@cprlaw.com


### DESIGNATION OF TRIAL COUNSEL

Pursuant to _Rule_ 4:25-4, Christopher M. Placitella, Esq., is hereby designated as trial

counsel in this matter. Mr. Placitella's attorney identification number is 027781981.

Dated: May 9, 2022                    **COHEN, PLACITELLA & ROTH, P.C.**


___/S/ Christopher M. Placitella_____
Christopher M. Placitella, Esq.

65

## CERTIFICATION

I hereby certify that to my knowledge the within matter in controversy is not the subject

of any other action pending in any court or of a pending arbitration proceeding, and that no other

action or arbitration proceeding is contemplated. I have no knowledge at this time of any non-

party who should be joined in this action.

Dated: May 9, 2022                          **COHEN, PLACITELLA & ROTH P.C.**


    /S/ Christopher M. Placitella
Christopher M. Placitella, Esq.

66

# Civil Case Information Statement

**Case Details: MIDDLESEX | Civil Part Docket# L-002204-22**

**Case Caption:** EDLEY DANIEL  VS JOHNSON & JOHNSON

**Case Initiation Date:** 05/09/2022

**Attorney Name:** CHRISTOPHER M PLACITELLA

**Firm Name:** COHEN PLACITELLA & ROTH PC

**Address:** 127 MAPLE AVE

RED BANK NJ 07701

**Phone:** 7327479003

**Name of Party:** PLAINTIFF : Edley, Daniel

**Name of Defendant's Primary Insurance Company** (if known): None

**Case Type:** OTHER Fraudulent Concealment and Spoliation, et al.

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Daniel Edley?** NO

**Are sexual abuse claims alleged by: Roger Edley?** NO

**Are sexual abuse claims alleged by: Estate of Laszlo "Louis" Edley?** NO

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

  **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

  **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** YES  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

05/09/2022                                                     /s/ CHRISTOPHER M PLACITELLA
Dated                                                                              Signed